NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

NEW MADRID MANUFACTURING
COMPANY, a Corporation, and Harold
Jones, an Individual, d/b/a Jones Man-
ufacturing Company, Respondents.

No. 14880.

United States Court of Appeals
Eighth Circuit.

Sept. 21, 1954.

Owsley Vose, Atty., National Labor Relations Board, Washington, D. C, (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Jean Engstrom, Atty., National Labor

Relations Board, Washington, D. C., with him on the brief), for petitioner.

Edward F. Sharp, New Madrid, Mo., for respondent New Madrid Mfg. Co.

Before SANBORN, JOHNSEN and COLLET, Circuit Judges.

JOHNSEN, Circuit Judge.

This is a petition by the National Labor Relations Board to have enforced an order issued by it, 104 N.L.R.B. No. 8, against New Madrid Manufacturing Co., a corporation, and Harold Jones, an individual, d/b/a Jones Manufacturing Co. New Madrid asks that enforcement of the order be denied. Jones has filed no answer or made other resistance to the Board's petition.

New Madrid was engaged in the business of manufacturing and distributing, as a processor, certain types of ladies' garments. It had its principal plant at New Madrid, Missouri, and for slightly over a year, prior to October 5, 1951, it had also been operating a branch plant at Malden, Missouri. Sometime about that date, it shut down the Malden plant, and in the latter part of November, 1951, it sold all the machinery, equipment and supplies thereof to Jones. Jones had been the manager of the Malden plant, while it was being operated by New Madrid. After the purchase by Jones, the machinery, equipment and supplies were moved to Portageville, Missouri, where Jones opened up a plant under the trade name of Jones Manufacturing Co.

The sale to Jones was made under a conditional sales contract, which required the payment by him of a certain purchase price, on a fixed installment basis, without prepayment privilege. In the contract, New Madrid had agreed to advance to Jones "sufficient funds to set up the plant proposed to be established at Portageville, Missouri," and to give Jones the manufacturing work on "at least fifteen thousand (15,000) dozen garments during a period of twelve (12) months after said factory shall have been placed in operation, provided, however, that deliveries are reasonable and are completed in the normal delivery time." New Madrid further agreed to make cash advances on such work as was being done for it at any particular time, to enable Jones to meet his payrolls. Jones in turn agreed that he would not engage in making garments for anyone else, except with New Madrid's approval. He also agreed not to draw out of the business, until the purchase price had been paid, more than a certain amount monthly in personal expenses and compensation, unless New Madrid gave its written consent thereto.

Charges of unfair labor practices, based on alleged hostility to union membership of its Malden employees, were filed against New Madrid, in relation to incidents occurring during the operation and to the shutting down of that plant, and when Jones began operating at Portageville, the charges were amended to include him and New Madrid jointly as employers, with respect to the wrongs claimed to have been done the Malden plant employees.[1] The complaint prepared by the Board's Regional Director, on which the matter was heard, entirely ignored the sale aspect of the transaction between New Madrid and Jones, and alleged that New Madrid had merely "delivered" the machinery and equipment to Jones, and that he was simply operating at Portageville "as the manager, agent and alter ego of * * * New Madrid," in a continuation by New Madrid of the Malden enterprise.

The Trial Examiner apparently thought it necessary to deal with the transaction between New Madrid and Jones on a little more definitive basis than this. He said that "the purported agreement * * * is not a real contract, that it was not intended to divest (New Madrid) of its title to the Malden

---

1. The operations of New Madrid at its principal plant in New Madrid, Missouri, are in no way involved in the present proceeding or in the Board's order, either as a matter of relationship to the unfair labor practices found or the remedial relief granted.

plant machinery and did not do so, that it was not intended to makes Jones independent of (New Madrid) as the owner of a business in Portageville, Missouri, operating under the name of Harold Jones, d/b/a Jones Manufacturing Company, and did not do so, and that said contract is a sham, and void as a defense to any of the allegations of unfair labor practices alleged in the complaint."

Regarding himself as thus having effected clearance from legal port, through such a logging of the transaction between New Madrid and Jones as "not a real contract," as "a sham," as not leaving Jones engaged in any enterprise of his own, and as being wholly "void as a defense," the Trial Examiner made bold to venture still further out to sea and envisioned for himself this unique constitutional shore: "As it is within the realm of the possible that Jones actually believes himself bound by an agreement which creates obligations cancellable at will by (New Madrid) [2] from which Jones cannot escape, but is bound to work for (New Madrid) at his present fixed 'drawing account', [3] the undersigned, in all kindness, directs Jones' attention to the Thirteenth Amendment to the Constitution of the United States as a possible means of escape should he ever desire to free himself of the burden of his obligations."

The Board, however, could not apparently see its way clear to go along on the Trial Examiner's logging of the contract between New Madrid and Jones as a mere sham and as not being required to be accorded any legal recognition in the situation. It said: "We do not decide, as did the Trial Examiner, that the sales contract between Jones and the Company, whereby the latter sold its Malden plant machinery to the former for use in Portageville is not 'a real contract' and of no binding effect upon Jones. The Board assumes the validity of the contract." But, went on the Board, "It is clear * * * that the Company retained substantial control over Jones' operations at Portageville;" that Jones therefore had become only a "partial successor to the Company's Malden plant business;" that, to whatever extent he thus had become a successor, "Jones had knowledge of his predecessor's unremedied unfair labor practices at the time he agreed to take over the business;" and that, on the basis of all of the foregoing, New Madrid and Jones were entitled to be regarded as constituting co-employers at the Portageville plant and to be held jointly and severally liable for the remedying of all the unfair labor practices which had existed in relation to the operations at the Malden plant and to New Madrid's shutting down of that plant.

A careful consideration of the entire record as a whole requires us to hold that, within the standards recog-

---

**2.** This statement of the Trial Examiner apparently has reference to the conventional default-and-insecurity clause contained in the contract, that "Should the second party fail to keep or perform any or all his agreements herein contained, and to promptly pay, when due, any and all sums provided for hereunder, or should second party remove or attempt to remove the said machinery, supplies or equipment, and attempt to lend, sell, or incumber said machinery and equipment, or whenever the first party or his assigns shall deem the debt herein provided insecure, said first party may, without demand or notice, take possession of said machinery and equipment wherever found, and without process of law, and all rights of the second party hereunder shall cease and terminate thereupon absolutely." The validity of this provision in general and the extent to which it might be permitted to be enforced in some particular situation are, of course, matters of Missouri law.

**3.** The contract provided that Jones should only withdraw from the business the sum of $50 a week, which was the same amount that he had received in salary as manager of the Malden plant. The record shows that New Madrid later consented to the withdrawal by him of the sum of $60 a week. Unless the contract was a sham and without legal effect, any earnings which the business made beyond this amount were of course Jones', even though they were left to accumulate upon the books as surplus.

nized as to reviews of findings made by the National Labor Relations Board, the evidence is sufficient to sustain the Board's findings here as to the unfair labor practices committed by New Madrid during its operation of the Malden plant. Just as much, also, as with the various incidents occurring during the actual operation of the Malden plant, which the Board appraised as having been unlawfully motivated, was the shutting down of the plant initially—to the time at least that New Madrid claims to have determined and acted to permanently close the business and dispose of its machinery and equipment—entitled to be found by the Board to have been in the nature of an intended lockout for purposes of combatting the unionization of the plant.

But we are not able to agree that the evidence affords a rational basis for the Board to declare that this initial shutdown or lockout never subsequently was intended to be or ever became converted into a permanent closing or quitting by New Madrid of the Malden enterprise, in the sense that, while it sold the machinery and equipment to Jones and Jones opened up and operated a business at Portageville, it would not have made such sale, and did not do so, except upon the basis of retaining such a right and power of control over Jones' operations as to make the Portageville plant, not the establishing of a new and individual enterprise by Jones, but in effect a continuation of the Malden enterprise, with Jones and New Madrid having come to share jointly the status and the responsibility of the previously existing employership.

The evidence shows affirmatively that after the initial shut-down or lockout had occurred at the Malden plant, New Madrid, during the period that the business was thus closed, had an audit made of the Malden books and operations by someone from the New Madrid plant; that this audit revealed a loss of $6,000 in the plant's activities for the period of slightly over a year that the small enterprise had been conducted; that the audit result was reported to and gone over by the officers and directors of the Company in the early part of November, 1951; and that—in the language of the Secretary-Treasurer of the Company —"The decision was made not to reopen the plant after we received operational figures on the performance during the period from when it commenced to the time it closed down."

The record seems to us to be without any substantial probative basis for inferring or finding that New Madrid did not in fact, after its receipt of this audit report, determine and act to permanently close and discontinue the Malden enterprise and dispose of its machinery and equipment on whatever basis it was necessary for it to do so. New Madrid, not unnaturally, first made known its decision to permanently close the Malden plant to Jones, who had been manager of the plant and who thus was being left without a job, and Jones, on his own initiative and in his own interest, as the affirmative testimony shows, inquired as to the possibility of his buying the machinery and equipment, on terms which he would be able to handle financially, so as to enable him to open up a small manufacturing business of his own. He engaged in consultation with third parties, including his father, before he entered into the deal which New Madrid offered to make with him. This deal, in its formal aspects, as we have said, the Board, unlike the Trial Examiner, has accepted as not being mere sham or subterfuge but as having legal validity and effect.

The sale transaction therefore first must be approached in relation to such legal realities as its terms and provisions ostensibly have created. And, unless those terms and provisions, either expressly or as a matter of reasonable implication, can be said to have given New Madrid a right or power of control over Jones' prerogatives of management in general, or over his labor relations in particular, there is no basis on the contract itself to brand Jones and New Madrid as having created the status of co-

employership in respect to the Portageville plant. The only other basis that then could exist to so regard them would be, if New Madrid, despite the lack of any such legal right or power under the agreement, could. from outside indication, be said to have been in fact exercising control over the labor relations, affairs and policies in the Portageville plant.

So far as the sales-contract is concerned, it contained, as we have said, a conventional, creditor-protecting, default-and-insecurity clause,[4] and a provision giving New Madrid the further right to impose a veto on Jones' drawing out of the business, in personal expenses and compensation,[5] more than a certain sum monthly, until his debt was paid. There also was a provision for the making of partial advances or progress payments by New Madrid, during the course of such work as was being done for it by Jones, and an agreement by Jones not to take on manufacturing work for other dress distributors without New Madrid's consent.

These provisions, of course, served to give New Madrid both creditor and garment-producer advantages as to the Portageville plant. But we do not think that they legally can be said to have granted any right or power of control over Jones' general prerogative of management in the plant or his conduct of the plant's internal affairs. Nor, in narrower aspect, but of no less importance as a test of employership for purposes of the Labor Management Relations Act, 29 U.S.C.A. § 141 et seq., does the contract, either expressly or by implication, purport to give New Madrid any voice whatsoever in the selecting or discharging of Jones' employees, in the fixing of wages for such employees, or in any other element of labor relations, conditions and policies in the plant.

Also, beyond this, as to the only other gate, as mentioned above, that might be open to possible co-employership, there is not an iota of evidence, either direct or circumstantial, that New Madrid ever in fact had exercised any hand, either in management prerogative generally or in labor-relations control in particular, in Jones' operation of the Portageville plant, or that it ever had assumed to claim either of such powers, or that Jones ever had recognized it as having any such right.

Thus, any regarding of New Madrid as possessing such a control in the Portageville plant, either as a matter of contract content or of extrinsic right from indicated fact, claim or recognition, seems to us to be wholly without any probative basis and to make that finding of the Board legally one of a purely conjectural nature in the situation.

■■ Necessarily, anyone who owns, or who engages in operating, for himself, a business having employees is an employer. And, under the Labor Management Relations Act, the term "employer" is made to include "any person acting as an agent of an employer, directly or indirectly," without it necessarily being controlling in such a situation "whether the specific acts performed were actually authorized or subsequently ratified". 29 U.S.C.A. § 152(1), (2) and (13). So, too, for purposes of the Act, it has been judicially recognized that anyone, whether specifically attached to the enterprise or not, who possesses such a right or power of control over its conduct as to have a responsibility for its labor affairs and relations, or who has been exercising such a dominion over its labor affairs and relations in fact, may properly be treated as an employer. See e. g. N. L. R. B. v. Lund, 8 Cir., 103 F.2d 815, 819; N. L. R. B. v. Somerset Classics, 2 Cir., 193 F.2d 613, 615.

■ Beyond this, also, one who takes over as owner and continues the business of a predecessor, with knowledge of the existence of unremedied unfair labor practices in the latter's operation, may, in fitting relation to the general purposes of the Act, and with justness but not attempted punitiveness of application to

---

**4.** See footnote 2, supra.

**5.** See footnote 3, supra.

the nature and circumstances of the particular successorship, have his employer's duty in effect related back, for purposes of remedying the statutory wrongs done the employees, comparably as an implied acceptance and assumption by him in respect to the labor situation of the enterprise. Cf. N. L. R. B. v. Adel Clay Products Co., 8 Cir., 134 F.2d 342; Regal Knitwear Co. v. N. L. R. B., 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661.

■■ But none of this can be taken to mean that an employer does not have the absolute right, at all times, to permanently close and go out of business, or to actually dispose of his business to another, for whatever reason he may choose, whether union animosity or anything else, and without his being thereby left subject to a remedial liability under the Labor Management Relations Act for such unfair labor practices as he may have committed in the enterprise, except up to the time that such actual and permanent closing or true and bona fide change in ownership has occurred. No one can be required to stay in private business, and no one can be prevented from permanently closing or abdicatingly selling such a business. And the Act affords no basis on which to order a person to reinstate employees in a business which he has, with plain finality, put out of existence, or which he has actually disposed of to another, and as to which he neither in law nor in fact possesses any power over the operations of his successor, either of management right in general or of labor-relations control in particular. Cf. Southport Petroleum Co. v. N. L. R. B., 315 U.S. 100, 106, 62 S.Ct. 452, 456, 86 L.Ed. 718, 726. No more, in our opinion, can the Act be said to contain any basis to assess remedial back-pay against such a person, beyond the date of his permanent closing or abdicating sale of the enterprise.

■ Again, while, as we have stated, a successor's taking over of an enterprise may be under such circumstances as to make it remedially proper under the Act to visit upon him the full or partial scope and consequence of his predecessor's un-

remedied unfair labor practices, there is no right to do so automatically or unappraisingly. It must be remembered that the Act does not purport to make the consequences of unremedied unfair labor practices a lien upon the enterprise, and there thus is no right to visit them upon a successor on that basis or in that administrative spirit. A successor can be made to bear the burden of his predecessor's labor-relations wrongs, only in sound remedial relationship to the nature and circumstances of his immediate successorship. Each situation must be given fair and rational appraisal, and the more realistically so where the predecessor's unfair labor practices have not, at the time that the enterprise is purchased, been the subject of charge before the Board or of other manifest objective indication, as a basis for viewing the successor as having in fact taken over the business in relation to these conditions and having in effect voluntarily accepted and impliedly assumed some measure of personal responsibility as to them.

■ In any event, at whatever time the successorship has occurred, any burden remedially attempted to be imposed upon a successor, for his predecessor's labor-relations wrongs, must be capable of being equitably regarded as having the intrinsic equivalence, in the particular circumstances, of a voluntary acceptance and implied assumption, although it is, of course, not necessary to so brand it formally. If the specific practices in which the predecessor has engaged are themselves repeated by the successor in the operation of the business, this alone, perhaps, without more, may afford a sufficient basis for the imputing of a responsibility, in the nature of an implied assumption, to redress the entire situation. But in every situation of imposed remedial burden, for a predecessor's labor-relations wrongs, there must be some basis of theory, reason and justice for subjecting a successor, who is so in both law and fact, to a responsibility for his predecessor's acts, beyond the mere na-

ked circumstance of his constituting a purchaser.

In the present situation, the manifest determination of New Madrid to permanently close its Malden plant, the actual sale to Jones of the machinery and equipment, and the lack of any existing power, either in law, on the contract, or in fact, from probative incidents, over Jones' prerogative of management generally or in relation to the conduct of his labor affairs at the Portageville plant, entitle the Board's order, as against New Madrid, in its affirmative aspects, to enforcement only to the extent of subjecting New Madrid to liability for employee back-pay up to November 28, 1951, the time of the sale to Jones.

As to Jones, there has been, as we have indicated, no answer or other resistance filed to the Board's petition for enforcement. On the evidence in the record, the Board was entitled to regard him as having been more than a mere naked purchaser-successor in the situation. There was testimony showing that he had personally participated in some of the unfair labor practices of New Madrid, during the time that he was manager or foreman of the Malden plant. His removal of the plant to Portageville, after his purchase from New Madrid, could properly be viewed as having had some motivating relationship at least to the unremedied situation at Malden and an escaping of the difficulties thereof in his successorship operations. And so the Board had the right to hold, as it did, that Jones legally could be charged with a several, and not merely a joint, liability "to remedy the unfair labor practices herein."

In this situation, and with no resistance having here been made by him to the Board's petition, we shall grant the Board's request for enforcement as to him, under our Rule 27(d), without consideration of whether he might have been able to obtain some modification of details of the Board's remedial order, had he sought to do so. The details of the Board's order are probably not of any particular moment to Jones, for it would appear that the result of the general relief granted is in any event going to be to wipe his small enterprise and its 23 local-community jobs off the economic scene. Thus, while the proceeding will have achieved a vindication of the Act in relation to Jones, it also will have served to destroy these 23 small-town jobs for everyone.

New Madrid has argued that the small amount of production involved is of such insignificance in relation to commerce that there should have been no assumption of jurisdiction by the Board over the situation. But the Board's order is not entitled to be attacked here upon that ground. In the first place, the finding of the Trial Examiner as to jurisdiction and the right of the Board to accept that finding were in no way challenged before the Board. Nor, as a matter of fact, would it be possible to say on the record before us that the Malden plant and the Portageville plant had not been within the volume of commerce, which the Board had adopted as its general jurisdictional standard and policy. Thus, the production indicated by the contract between New Madrid and Jones and the prices shown by the testimony to be involved in that production, for example, do not lend support to New Madrid's jurisdictional contention.

Beyond all this, however, without any challenge having been made before the Board against the Trial Examiner's finding on jurisdictional fact, the question of jurisdiction would at most be one of purely naked legal aspect as to the general scope of the Act itself. And, on that question, it is, of course, clearly settled that the operation of the Act does not legally depend on any particular volume of commerce being affected "more than that to which courts would apply the maxim de minimis." N. L. R. B. v. Fainblatt, 306 U.S. 601, 607, 59 S.Ct. 668, 672, 83 L.Ed. 1014; N. L. R. B. v. Denver Building & Construction Trades Council, 341 U.S. 675, 684–685, 71 S.Ct. 943, 95 L.Ed. 1284.

Enforcement of the Board's order is granted to the extent indicated above.