294 F.2d 364
 DISTRICT 65, RETAIL, WHOLESALE AND DEPARTMENT STORE UNION, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
Morris and David YOSEPH d/b/a M. Yoseph Bag Company, Respondent.
 No. 13358.
 No. 13406.
 United States Court of Appeals Third Circuit.
 Argued April 3, 1961.
 Decided September 18, 1961.
 
 Irving Rozen, New York City (Weisman, Allan, Spett & Sheinberg, New York City, M. H. Goldstein, Philadelphia, Pa., Joel A. Windman, New York City, on the brief), for petitioner Union.
 Samuel M. Singer, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Glen M. Bendixsen, Attys., N.L.R.B., Washington, D. C., on the brief), for National Labor Relations Board.
 Geoffrey J. Cunniff, Philadelphia, Pa. (Josephine H. Klein, Philadelphia, Pa., on the brief), for respondent M. Yoseph Bag Co.
 Before BIGGS, Chief Judge, and McLAUGHLIN and HASTIE, Circuit Judges.
 BIGGS, Chief Judge.
 
 
 1
 The National Labor Relations Board has petitioned for enforcement of its order against Morris and David Yoseph d/b/a M. Yoseph Bag Company, and District 65, Retail, Wholesale and Department Store Union, AFL-CIO, has petitioned to review and to modify the Board's order.[1] The Board found that the Company violated Sections 8(a) (1) and 8(a) (3) of the Labor Management Relations Act, 29 U.S.C.A. §§ 158(a) (1), (3) by closing its plant and discharging its employees; that the Company violated Section 8(a) (5) of the Act, 29 U.S. C.A. § 158(a) (5) by refusing to bargain with District 65; and that the Company violated Section 8(a) (1) of the Act by interrogating and threatening its employees. District 65 has argued in this court that the remedy embodied in the Board's order is of too narrow scope to effectuate the policies of the Act. The Company has argued that the Board's decision is without basis in law and, alternatively, that its order was improper in various particulars. The facts, as found by the Board, are as follows.
 
 
 2
 The Company was a New Jersey partnership engaged in the business of purchasing feed bags, cleaning and repairing them, and selling the reconditioned bags to various customers. By July 11, 1957, District 65, a labor organization within the meaning of the Act, had been designated by 14 of the Company's 16 employees as their bargaining representative. On that date, Saul Klein and Romadell Jones, organizers for District 65, called David Yoseph, one of the partners, at his home, informed him of District 65's majority status, and requested recognition as the collective bargaining agent of the Company's employees. Yoseph asserted that the Company's financial position was deteriorating due largely to the inroads made by the "bulk feed system," a system by which feed is delivered by truck directly from mill to farm thus obviating the need for bags, and that he was in the process of deciding whether to remain in business. Yoseph requested a week's time in which to talk to his employees and to come to a decision.
 
 
 3
 The next day, July 12, David Yoseph asked an employee, Vernal Soltau, why he had joined District 65. Yoseph told Soltau "It is going to be hard for you" because the Company was "going to cut us [sic] down to 40 hours a week." After making this threat Yoseph deprived Soltau and another employee, Robert Johnson, of all overtime work. On July 15, Yoseph questioned employee Annie Johnson as to her knowledge of District 65. That same day Yoseph said to employee Randolph Allen, one of the Company's truckdrivers, "I know that you joined that union, but with or without the union would you still continue buying bags for me? I am going to close the plant down and if I can have the two drivers, including myself and the other driver, I would have the union licked."
 
 
 4
 On the morning of July 19, Yoseph assembled his employees and told them that he could not pay the wage rates demanded by District 65 and remain in business, but that he had looked over the wage rates of the "Philadelphia Union", Laborers Local No. 57, AFL-CIO, and if the employees would choose that union instead of District 65 he could stay in business. Yoseph gave the employees until 4 p. m. to make their decision stating that he had agreed to notify District 65 of his decision by 4:30 p. m. Sometime that afternoon the employees told Yoseph that they would remain with District 65. At 4:30 p. m. Romadell Jones, District 65's assistant organizer, arrived at the plant and, in the presence of the assembled employees, was told by Yoseph that the business was being closed because he could not pay District 65's wage rates. When Jones replied that District 65 was willing to negotiate wage rates and that he was sure an agreement could be reached, Yoseph refused to discuss the matter further. The Company discharged all of its employees by closing its plant and going out of business as of July 19. Yoseph, however, continued to receive and deliver bags for some time thereafter.
 
 
 5
 On August 17, 1957, Yoseph, by bill of sale, sold the assets of the Company, except for its land, buildings and two pieces of equipment, to the Girard Bag Company of Philadelphia in exchange for $46,000 worth of the capital stock of Girard.[2] Subsequently, and at the present time, the functions previously performed by the Company are performed by Girard which serves the same customers in the same area. Yoseph is presently a stockholder, director and officer of Girard and is in charge of production at Girard's Philadelphia plant where he spends full time. He does not supervise any particular phase of Girard's business.
 
 
 6
 On the basis of these facts four members of the Board agreed on the following conclusions of law:
 
 
 7
 "By discriminating in regard to the hire and tenure of employment of the employees by closing its plant and discharging the employees on July 19, 1957, the Respondent has discouraged membership in a labor organization and by such discrimination and by interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act, as hereinabove found, the Respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(a) (3) of the Act and Section 8(a) (1) thereof.
 
 
 8
 "By refusing, on and after July 19, 1957, to bargain collectively with the aforesaid Union as the exclusive representative of the employees, in the aforesaid appropriate unit, the Respondent has engaged in and is engaging in, an unfair labor practice within the meaning of Section 8(a) (5) of the Act.
 
 
 9
 "By interrogating the employees, threatening to deprive them of overtime and in fact doing so, threatening individual employees that the plant would be closed, and threatening assembled employees, on July 19, 1957, that the plant would be closed if they did not renounce their chosen representative, the Respondent engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(a) (1) of the Act."
 
 
 10
 Member Rodgers did not agree that the Company committed any unfair labor practice because in his view "there is nothing contained in the Act which limits an employer's right to go out of business at such time and under such circumstances as he chooses, regardless of the reasons therefor."
 
 
 11
 The Board ordered the Company, "its officers, agents, successors, and assigns" to cease and desist from refusing to bargain collectively with District 65, threatening and interrogating employees in a manner violating Section 8(a) (1) of the Act, and discouraging membership in District 65 by discriminating as to hire and tenure or by discharging employees for their union activities. The Board further ordered the Company to take the following affirmative action: to bargain with District 65 if and when operations are resumed; to pay back pay to the discharged employees for the period commencing July 19, 1957 and ending August 17, 1957, the date the business was sold, or the date the business ceased functioning, whichever was later; to create a preferential hiring list and to offer the employees reinstatement in the event operations are resumed; and to mail the usual notices to the discharged employees.
 
 
 12
 The right to modify the back pay and reinstatement provisions of the order if made necessary by circumstances not then apparent was reserved.[3]
 
 
 13
 Members Jenkins and Fanning concurred in the order "as far as it goes" but were of the opinion that it should have been expanded "by awarding back pay to the discriminatees for loss of earnings resulting from the discrimination against them until such time as they obtained substantially equivalent employment with other employers." As we have stated Member Rodgers was of the view that no unfair labor practice had been committed and, therefore, did not discuss the propriety of the extent of the order.
 
 
 14
 District 65 contends that the Board's remedy was inadequate and this court should modify it so as to include the following: a direction to the Company to reopen its plant and reinstate the employees with back pay to the date of reinstatement or; a direction to the Company to reinstate the employees, with back pay to the date of reinstatement, in Girard Bag Company, with resultant moving or transportation expenses or; a direction to the Company to pay back pay to the employees until they obtain substantially equivalent employment. District 65 seems to view the present case as one in which an employer, motivated by antiunion animus, "runs away" to a different location in violation of the Act. Alternatively, District 65 seems to suggest the Board's view of the law which is that an employer, who either discontinues operations, permanently goes out of business, or goes out of business and disposes of the business and as an incident thereto discharges his employees, is guilty of an unfair labor practice where his action is motivated by antiunion animus.
 
 
 15
 The Company, on the other hand, views the case as one in which an employer has completely and permanently gone out of business and sold his business and argues, that regardless of his motivation, the Act does not and constitutionally could not provide that such action constitutes an unfair labor practice. In support of its contention the Company relies heavily on the decision of the Court of Appeals for the Eighth Circuit in N. L. R. B. v. New Madrid Mfg. Co., 1954, 215 F.2d 908 and on Member Rodger's dissents in Barbers Iron Foundry, 126 NLRB 30 (1960), Bonnie Lass Knitting Mills, Inc., 126 NLRB 1396 (1960), and in the instant case. Alternatively, the Company challenges the validity of various specific provisions of the Board's order.
 
 
 16
 The Board takes an intermediate position which is reflected in its decision. The Board cites cases in which employers have discharged their employees and have either moved their business or partially gone out of business and in which courts have held that such action, where motivated by antiunion animus, constituted an unfair labor practice. See, e. g., N. L. R. B. v. Wallick, 3 Cir., 1952, 198 F.2d 477; N. L. R. B. v. Missouri Transit Co., 8 Cir., 1957, 250 F.2d 261. The Board argues that no distinction should be drawn between these cases and those in which an employer completely and permanently goes out of business. With respect to the Company's contention that the Act cannot restrict a person's absolute right to go out of business the Board argues that that contention is directed solely to the issue as to what remedy the Board may prescribe once an employer has ceased operations and not to the question whether an unfair labor practice was committed. Against both the Company and District 65, the Board argues that its order was a reasonable exercise of its discretion.
 
 
 17
 There is no doubt that the Board's finding that the Company, in threatening and interrogating its employees respecting their union activities before and on July 19, 1957, engaged in unfair labor practices within the meaning of Section 8(a) (1) of the Act, is supported by substantial evidence on the whole record and is sound in law. The Company does not raise any serious question with respect to this aspect of the Board's decision. Serious questions are presented, however, with respect to the Board's finding that by closing the plant and discharging its employees on July 19 the Company committed unfair labor practices within the meaning of Sections 8(a) (1) and 8 (a) (3). As previously indicated, the contention is made that the act of completely and permanently going out of business cannot give rise to an unfair labor practice. The Board's finding that the Company violated Section 8(a) (5) of the Act by refusing to bargain with District 65 on and after July 19 is challenged on the same ground, the argument being that the refusal to bargain was an incident of the Company's permanently going out of business on July 19.
 
 
 18
 We believe that it must be conceded that if the decision to discontinue operations permanently and go out of business was made after July 19, the Company's acts on July 19 of refusing to bargain, and discharging its employees were unfair labor practices within the meaning of the Act. This would be so even if the Company eventually decided to go out of business completely and permanently and even though business, as in the present case, was never resumed by the Company after the initial shutdown. It is obvious that an employer cannot absolve himself of unfair labor practices simply by going out of business sometime after he has engaged in those practices. It becomes critical, therefore, to determine whether the Company did in fact decide to go out of business and actually go out of business on July 19 for, if it did not, the Company's argument based on an asserted absolute right to go out of business for any reason is not pertinent to the facts of this case.
 
 
 19
 According to the Board the "shut down of a plant and/or [the] sale of a business with resultant discharges", where motivated by antiunion animus, constitutes an unfair labor practice. This is true, in the Board's view, regardless of whether the shutdown of the plant is pursuant to a decision to completely go out of business or whether it be a temporary antiunion measure. It follows that in the Board's view the factual issue whether on July 19 the Company ceased operations completely and permanently or whether it merely discharged its employees and temporarily ceased operations would be immaterial to the decision: in either case an unfair labor practice would have been found to exist. Since the Board believed that the issue whether the Company went completely out of business as of July 19 was immaterial it did not make an explicit finding on that point. In its opinion it states that "All employees were terminated as of July 19, 1957, but the [Company] did not cease functioning entirely." A few pages later in its opinion it found "that the * * * [Company] discriminated in regard to its employees tenure of employment by closing its plant and going out of business." In the next paragraph of the opinion, however, it is stated that "We have found that the * * * [Company] did not go out of business until July 19 (if, indeed, then)." In the conclusions of law the Board states that the Company committed an unfair labor practice "by closing its plant and discharging the employees on July 19, 1957", but it does not indicate whether the shutdown was pursuant to a decision to go completely out of business. Under the heading "Remedy" the Board states that the Company "has permanently discontinued its business operations", but that statement speaks as of the time of the Board's decision and does not shed any light on the question whether the shutdown of July 19, 1957, was pursuant to a decision to go out of business completely and permanently. Moreover, the Board's back pay order encompasses the period between July 19, the date of the shutdown, and August 17, the date on which the Board found the Company's assets to have been sold to Girard Bag Company "or until the * * * [Company] in fact ceased functioning whichever was later." This statement adds a further ambiguity in that it seems unclear whether the Board found only that the sale was concluded on August 17 or that the actual decision to go out of business was made on or about that date.
 
 
 20
 We regard the contentions of the Company, District 65 and the position of the Board as raising substantial questions. We believe that we should not and cannot resolve these questions without more complete findings of fact by the Board and a clearer indication of precise bases of its decision. Accordingly we shall remand the case to the Board with directions to clarify its findings. Specifically, the Board should determine on or about what date the decision was made that the Company completely and permanently should go out of business. Second, the Board should determine the date on which the Company did, in fact, go out of business. Third, the Board should indicate what importance, if any, it attaches to the fact that the business of the Company was taken over by Girard Bag Company, a corporation of which David Yoseph is a director, officer and substantial stockholder. If the Board believes that additional evidence is needed it should hold hearings and secure the necessary evidence. In making this disposition we are not unmindful of the fact that the additional findings that we have directed the Board to make need not have been made under its view of the law. We, however, are presented with novel and serious questions, the decision of which could be rendered unnecessary or otherwise altered in the light of further findings by the Board which would clarify the precise bases of the Board's decision. Under these circumstances and in the exercise of our discretion we will refuse to enter a decree enforcing the Board's order at this time. Our refusal to enter a decree of enforcement shall be deemed to be without prejudice to any party. We will remand the case to the Board to the end that it may take such further action, including that which we have indicated, as may be required. An appropriate order may be submitted.
 
 
 
 Notes:
 
 
 [1]
 The two proceedings were consolidated for hearing on October 4, 1960 by order of this court
 
 
 [2]
 Yoseph testified that the sale to Girard was orally consummated on July 15, 1957. This testimony is contradicted by the Board's findings, supported by substantial evidence on the whole record, that on July 19, 1957, Yoseph offered to keep the plant open if the employees would reject District 65. Under these circumstances, and in the absence of a clearer indication of when the actual sale was concluded, the Board was justified in finding that the date on the bill of sale was the date on which the actual sale took place
 
 
 [3]
 The full text of the Board's order is as follows:
 "ORDER
 "Upon the entire record in this case, and pursuant to Section 10(c) of the National Labor Relations Act, as amended, the National Labor Relations Board hereby orders that the Respondent, Morris and David Yoseph, d/b/a M. Yoseph Bag Company, Bridgeton, New Jersey, its officers, agents, successors, and assigns, shall:
 "1. Cease and desist from:
 "(a) Refusing to bargain collectively with District 65, Retail, Wholesale and Department Store Union as the exclusive representative of all the employees in the appropriate unit consisting of all production and maintenance employees including truck drivers, of the Employer's Bridgeton, New Jersey, plant, excluding office clerical employees, guards and supervisors as defined in the Act;
 "(b) Threatening employees with loss of employment if they do not renounce the Union as their collective bargaining representative;
 "(c) Threatening to deprive employees of overtime and to close the plant;
 "(d) Interrogating employees in a manner violating Section 8(a) (1) of the Act;
 "(e) Discouraging membership in District 65, Retail, Wholesale and Department Store Union or in any other labor organization of its employees, by discriminating in any manner in respect to their hire or tenure of employment, or any term or condition of employment;
 "(f) Discouraging membership in the above-named labor organization or any other labor organization by discharging employees for their union activities;
 "(g) In any other manner interfering with, restraining, or coercing its employees in the exercise of the right to selforganization, to form labor organizations, to join or assist District 65, Retail, Wholesale and Department Store Union, or any other labor organization, or bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purposes of collective bargaining or other mutual aid or protection, or to refrain from any or all such activities, except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment, as authorized in Section 8(a) (3) of the Act, as modified by the Labor Management Reporting and Disclosure Act of 1959.
 "2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:
 "(a) If and when the Respondent resumes its operations, bargain collectively, upon request, with District 65, Retail, Wholesale and Department Store Union as the exclusive representative of all employees in the appropriate unit here found, and embody any understanding reached in a signed agreement;
 "(b) Make whole those individuals found discriminated against for any loss they may have suffered by reason of the discrimination against them in the manner set forth in the section of the Decision herein entitled `The Remedy';
 "(c) Upon request, make available to the Board or its agents, for examination and copying, all payroll records, social security payment records, timecards, personnel records and reports, and all other records necessary for determination of the amount of back pay due under the terms of this Order;
 "(d) Create a preferential hiring list containing the names of all those individuals found herein entitled to reinstatement if and when the Respondent resumes its operations, such reinstatement rights arising from the layoff of the individuals on July 19, 1957. The Respondent shall notify the Union and all said listed employees of the establishment of said list and its content and shall offer all said individuals full reinstatement to their former or substantially equivalent positions without prejudice to their seniority or other rights and privileges previously enjoyed if and when the Respondent resumes its operations, all as set forth in the section entitled `The Remedy';
 "(e) Inasmuch as the posting of a notice as customarily required would result in a notice posted in a plant not operating and therefore be inadequate to inform affected parties, the Respondent shall mail an exact copy of the notice attached hereto as `Appendix', to the Union and to each of the employees. Copies of said notice to be furnished by the Regional Director for the Fourth Region, shall, after being duly signed by an authorized representative of the Respondent, be mailed immediately after receipt thereof;
 "(f) Notify the Regional Director for the Fourth Region in writing, within ten (10) days from the date of this Order, what steps the Respondent has taken to comply herewith.
 "IT IS FURTHER ORDERED that the Board reserves to itself the right to modify the back pay and reinstatement provisions of this Order, if made necessary by circumstances not now apparent."