United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 11, 2000 Decided January 9, 2001 

 No. 99-1441

 Association of Communications Enterprises, 
 Appellant

 v.

 Federal Communications Commission, 
 Appellee

 AT&T Corporation, et al., 
 Intervenors

 Appeal of an Order of the 
 Federal Communications Commission

 Charles C. Hunter argued the cause for appellant and 
supporting intervenor Competitive Telecommunications Asso-
ciation. With him on the briefs were Catherine M. Hannan 
and Robert M. McDowell.

 Peter D. Keisler argued the cause for intervenor AT&T 
Corp. With him on the brief were Mark C. Rosenblum, Roy 
E. Hoffinger and C. Frederick Beckner III.

 John E. Ingle, Deputy Associate General Counsel, Federal 
Communications Commission, argued the cause for appellee. 
With him on the brief were Christopher J. Wright, General 
Counsel, and Laurence N. Bourne, Counsel.

 Michael K. Kellogg argued the cause for intervenor SBC 
Communications Inc. With him on the brief were James D. 
Ellis and Martin E. Grambow.

 Before: Edwards, Chief Judge, Rogers, Circuit Judge, and 
Silberman, Senior Circuit Judge.*

 Opinion for the Court filed by Senior Circuit Judge 
Silberman.

 Silberman, Senior Circuit Judge: The Association of Com-
munications Enterprises appeals from an order of the Feder-
al Communications Commission approving the transfer of 
Commission licenses from Ameritech Corp. to SBC Communi-
cations Inc. in connection with the merger of the two compa-
nies. The order allows the merged company to avoid statuto-
ry resale obligations on certain advanced telecommunications 
services by providing those services through a subsidiary. 
We vacate.

 I.

 As all observers of the American telecommunications sys-
tem are well aware, when a 1982 consent decree dismantled 
the Bell monopoly over many telecommunications services, 
the Bell System's local exchange operations were severed 
from its other operations and split geographically among 
seven Regional Bell Operating Companies (RBOCs). Ameri-
tech and SBC were both RBOCs and provided various states 
with local exchange and exchange access services, which 
depend critically on maintenance and operation of the "local 
loop," the physical infrastructure by which wire-based tele-

__________
 * Senior Judge Silberman was in regular active service at the 
time of oral argument.

phone service is provided. Because the local loop is a natural 
monopoly, control over it allowed the Bell System, and then 
RBOCs, to control telecommunications access to most homes 
and businesses.

 Today the Telecommunications Act of 1996 governs the 
obligations of telecommunications carriers such as Ameritech 
and SBC.1 The Act imposes on carriers certain duties in-
tended to open telecommunications markets to competition. 
The Act's strictest obligations are levied on "incumbent local 
exchange carriers" (ILECs), which are those local exchange 
carriers (LECs) that were providing a given area with mo-
nopoly or near-monopoly telephone exchange service on the 
Act's enactment date, as well as their successor and assigns.

 ILECs are subject to stringent market-opening duties. Of 
particular relevance to this appeal is the Act's ILEC resale 
obligation, 47 U.S.C. s 251(c)(4), which requires ILECs "to 
offer for resale at wholesale rates any telecommunications 
service that the carrier provides at retail to subscribers who 
are not telecommunications carriers." Section 251(c) also 
requires ILECs to negotiate in good faith, to provide inter-
connection with other telecommunications carriers, to provide 
unbundled access to network elements where technologically 
feasible, and to allow physical collocation of equipment neces-
sary for interconnection or access to unbundled network 
elements.

 For some time, various ILECs have argued that ILECs' 
s 251(c) resale obligations should not extend to their provi-
sion of so-called advanced services because ILECs do not 
exercise market power over those services. The Act defines 
"advanced services," regardless of transmission medium or 
technology, "as high-speed, switched, broadband telecommu-
nications capability that enables users to originate and receive 
high-quality voice, data, graphics, and video telecommunica-
tions using any technology."2 ILECs contended before the 

__________
 1 See Telecommunications Act of 1996, Pub. L. No. 104-104, 110 
Stat. 56 (codified at 47 U.S.C.A. s 151 et seq. (Supp. 2000)).

 2 Advanced services differ from most traditional telecommunica-
tions services in that they are digital, not analog. Instead of 

Commission both that ILECs are not subject to s 251(c) in 
their provision of advanced services and that, even if s 251(c) 
does apply to ILEC's advanced services, the Commission 
should simply forbear from applying it. The Commission 
rejected both arguments. The Commission determined that 
advanced services are telecommunications services like any 
others and may not be provided by an ILEC unless the ILEC 
complies with s 251(c).3 It also determined that it lacked 
authority to forbear from applying s 251(c) to advanced 
services. It concluded that exempting ILEC-provided ad-
vanced services from s 251(c) market-opening obligations "is 
at odds with the technology[-]neutral goals of the Act and 
with Congress' aim to encourage competition in all telecom-
munications markets." (Emphasis added).

 In 1998 Ameritech and SBC proposed a stock-for-stock 
merger that would make Ameritech a wholly owned subsid-
iary of SBC. The merging companies filed a joint application 
requesting Commission approval to transfer control to SBC of 
licenses and lines owned and controlled by Ameritech. The 
Commission determined that this application compelled it to 
consider whether the merger as a whole--not just the trans-
fer of individual lines--was consistent with the Act. Appel-
lant Association of Communications Enterprises (ASCENT),4 

__________
maintaining a continuous channel of communications for the entire 
information transfer, advanced services are usually transferred in 
multiple discrete bundles of digital information, called "packets," 
that are transmitted individually over the most efficient route 
available, and then reassembled instants later at their destination. 
This process of separate transmission and subsequent reassembly is 
called "packet-switching."

 3 See Deployment of Wireline Services Offering Advanced Tele-
communications Capability, 13 F.C.C.R. 24,012, p p 11, 66-67 (Aug. 
6, 1998) (Deployment Order); Deployment of Wireline Services 
Offering Advanced Telecommunications Capability, 15 F.C.C.R. 385, 
p p 10-11 (Dec. 23, 1999), pet. for review filed sub nom. MCI 
WorldCom, Inc. v. FCC, No. 00-1002 (D.C. Cir. filed Jan. 3, 2000); 
Deployment of Wireline Services Offering Advanced Telecommuni-
cations Capability, 14 F.C.C.R. 19,237, p 3 (Nov. 9, 1999).

 4 During its opposition to the joint application, ASCENT was 
known as the Telecommunications Resellers Association. For clari-
ty's sake we use the association's new name throughout.

a national trade association representing telecommunications 
providers and resellers, opposed the application. ASCENT 
alleged that the merger of two of the largest ILECs would 
hinder competition and urged that certain competition-
enhancing conditions be imposed on the merged company, 
after which Ameritech and SBC supplemented their applica-
tion to include a package of voluntary commitments.

 The Commission approved the merger and permitted the 
new company to offer advanced services through a separate 
affiliate and, by doing so, avoid s 251(c)'s duties.5 Although 
the Act extends an ILEC's market-opening obligations, in-
cluding the requirement that an ILEC sell its telecommunica-
tions services to a reseller at wholesale prices, to an ILEC's 
"successor or assign," the Commission adopted a presumption 
that the advanced services affiliate is not such a successor or 
assign so long as it complies with various structural and 
transactional safeguards.6 These include independent opera-
tions, separate officers, directors, employees, books, records, 
and accounts, and transactions with SBC/Ameritech conduct-
ed on an arm's length basis. It is important to note that 
although this case arises out of a merger proceeding, the 
Commission's order has a broader application. Any ILEC 
would be entitled, according to the Commission's logic, to set 
up a similar affiliate and thereby avoid s 251(c)'s resale 
obligations.

 II.

 Appellant's primary argument is that the Commission's 
order is simply a device to accomplish indirectly what the 
statute clearly forbids: the Commission's exercise of forbear-
ance authority over an ILEC's provision of advanced services. 
Under the order ILECs can circumvent s 251(c)'s require-

__________
 5 See Applications of Ameritech Corp. and SBC Communications 
Inc., 14 F.C.C.R. 14,712, p 349 (Oct. 6, 1999) (Merger Order).

 6 The Merger Order provides that if a court determines that the 
affiliate is a successor or assign under the specified conditions, then 
the new company's obligation to provide advanced services only 
through an affiliate would terminate.

ment that they offer advanced services at wholesale prices by 
merely creating a subsidiary--albeit a subsidiary that must 
operate somewhat separately from the ILEC. And according 
to appellant, Congress manifested a clear intent that the 
Commission not forbear from regulating any ILEC's telecom-
munications services, including advanced services, unless cer-
tain market conditions are met. Intervenor AT&T trains its 
fire on the Commission's interpretation of the phrase "succes-
sor or assign," claiming that its construction of those terms is 
inconsistent with a number of cases in which those terms are 
defined as used in other statutes. The Commission insists 
that it is not actually utilizing its forbearance authority and 
that the phrase "successor or assign" is sufficiently ambigu-
ous so that under Chevron U.S.A. Inc. v. Natural Resources 
Defense Council, Inc., 467 U.S. 837 (1984), we are obliged to 
defer to the Commission's interpretation. As should be obvi-
ous, these arguments are quite interrelated. For even if we 
conclude that the Commission has not formally used its 
forbearance authority and that the phrase "successor or 
assign" is ambiguous, the meaning of the statute, as revealed 
by its structure, may render the Commission's "successor or 
assign" construction unreasonable.

 Section 10 of the Act provides in relevant part:

 ... [T]he Commission shall forbear from applying any 
 regulation or any provision of this chapter to a telecom-
 munications carrier or telecommunications service, or 
 class of telecommunications carriers or telecommunica-
 tions services, in any or some of its or their geographic 
 markets, if the Commission determines that--
 
 (1) enforcement of such regulation or provision is not 
 necessary to ensure that the charges, practices, classifi-
 cations, or regulations by, for, or in connection with that 
 telecommunications carrier or telecommunications ser-
 vice are just and reasonable and are not unjustly or 
 unreasonably discriminatory;
 
 (2) enforcement of such regulation or provision is not 
 necessary for the protection of consumers; and
 
 (3) forbearance from applying such provision or regu-
 lation is consistent with the public interest.
 
47 U.S.C. s 160(a). But the Commission "may not forbear 
from applying the requirements of section 251(c) ... until it 
determines that those requirements have been fully imple-
mented." 47 U.S.C. s 160(d). Because those requirements 
have not been fully implemented here, the FCC (as it con-
cedes) may not forbear.7

 Appellant argues that the Merger Order is "the legal and 
practical equivalent" of forbearance. In other words, to apply 
s 251(c) as narrowly as the Commission has done is akin to 
forbearing from regulating. The Commission insists that it is 
not actually "forbearing" but rather interpreting s 251(c) not 
to apply to this affiliate structure. In other words, the 
definition of ILEC in s 251(h) does not explicitly mention 
affiliates, so the Commission claims authority to determine 
case by case whether a particular affiliate is an incumbent 
LEC or not. When it does so it is interpreting the statute 
rather than determining whether to forbear.

 We think appellant's argument is a powerful one. Al-
though the Commission has not explicitly invoked forbearance 
authority (in direct violation of s 10), to allow an ILEC to 
sideslip s 251(c)'s requirements by simply offering telecom-
munications services through a wholly owned affiliate seems 
to us a circumvention of the statutory scheme. The Commis-
sion justifies its order by drawing our focus to its definition of 
"successor and assign." The Commission reasons that the 
affiliate structure it approved would be illegal only if it were 

__________
 7 Section 706 of the Act provides in relevant part that "[t]he 
Commission ... shall encourage the deployment on a reasonable 
and timely basis of advanced telecommunications capability to all 
Americans ... by utilizing, in a manner consistent with the public 
interest, convenience, and necessity, ... regulatory forbearance." 
47 U.S.C.A. s 157 note. Ameritech and SBC argued that s 706 is 
an independent grant of authority to forbear, but the Commission 
concluded that s 706 was only an instruction that the Commission 
should utilize s 10's forbearance authority in the context of ad-
vanced services. See Deployment Order p p 68-69.

obliged to treat an affiliate as a successor and assign of an 
ILEC, because only under these circumstances would 
s 251(c)'s requirements carry over to the affiliate. And since 
"successors and assigns" is not defined in the Act, the Com-
mission's definition is entitled to Chevron deference.

 The Commission's approach gives rise to a fierce argument, 
mounted particularly by intervenor AT&T, that the Commis-
sion's definition of successor and assign is impermissible. 
AT&T draws particularly on NLRB cases to claim that the 
affiliate must be thought a successor or assign. See, e.g., Fall 
River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 107 
S. Ct. 2225 (1987); NLRB v. New Madrid Mfg. Co., 215 F.2d 
908, 911 (8th Cir. 1954). AT&T emphasizes that the affiliate 
markets the same category of services to the same body of 
potential customers as did SBC/Ameritech. The Commission 
decided the affiliate was not a successor or assign essentially 
because the company did not transfer its "traditional business 
operations"--its monopoly assets. Thus, the Commission has 
permitted, through the technique of defining successor and 
assign to exclude the transfer of advanced services to an 
affiliate, the very result it had previously rejected--allowing 
an incumbent LEC to avoid the resale obligation on its 
advanced services.

 Paradoxically the Commission is using language designed 
by Congress as an added limitation on an ILEC's ability to 
offer telecommunications services as a statutory device to 
ameliorate s 251(c)'s restriction. We do not think that in the 
absence of the successor and assign limitation an ILEC would 
be permitted to circumvent s 251(c)'s obligations merely by 
setting up an affiliate to offer telecommunications services. 
The Commission is thus using the successor and assign 
limitation as a form of legal jujitsu to justify its relaxation of 
s 251(c)'s restrictions.

 That an ILEC would not be permitted to avoid the limita-
tions on telecommunications services--including advanced 
services--through a wholly owned affiliate, even in the ab-
sence of the "successor or assign" restriction, is evident by 
examination of the very provision on which the Commission 

relies to justify the affiliate structure in this case. The 
Commission looks to 47 U.S.C. s 272, which allows ILECs to 
provide certain maintenance and long-distance services--but 
not advanced services--through a separate affiliate. As set 
out in the Merger Order, the advanced services affiliate must 
"operate largely in accordance with the structural, transac-
tional, and nondiscrimination requirements of [47 U.S.C. 
s] 272(b), (c), (e), and (g)." Merger Order p 364.

 But s 272 applies only to manufacturing activities, telecom-
munications services between different local access and trans-
port areas (LATAs), and interLATA information services--
not advanced services. See 47 U.S.C. s 272(a)(2). It sets out 
a series of formal structural and transactional obligations 
intended to check LECs' incentive to leverage their bottle-
neck assets into market power over other telecommunications 
services. LECs can provide the services covered by s 272 
only through a separate affiliate, which must "operate inde-
pendently" of its LEC; maintain separate books, records, and 
accounts; have separate officers, directors, and employees; 
and conduct all transactions with its parent LEC "on an arm's 
length basis ... reduced to writing and available for public 
inspection." Id. s 272(b)(1)-(3), (5). The LEC is prohibited 
from discriminating between its s 272 affiliate and other 
entities "in the provision or procurement of goods, services, 
facilities, and information, or in the establishment of stan-
dards." Id. s 272(c)(1).

 To be sure, obligations substantially similar to these bind 
the new company and its advanced services affiliate by force 
of the Merger Order. See Merger Order p 364.8 But s 272 

__________
 8 While the advanced services affiliate must be separate from the 
merged company as a matter of corporate form, its separation does 
not extend to various other matters, including some that constitute 
deviations from the provisions of s 272. The Merger Order pro-
vides for certain joint services, including joint marketing and per-
formance of certain customer care services. Certain operation, 
installation and maintenance functions of the affiliate may be per-
formed by the merged company, and the affiliate may use the 

is not only an inapt analogy, it actually undermines the 
Commission's position. As intervenor AT&T points out, s 272 
affiliates are established primarily to provide interLATA 
telephone service, which an ILEC is generally barred from 
providing. See 47 U.S.C. s 271. Since the ILEC may not 
provide this service in the first place, the s 272 affiliate 
obviously does not succeed to an existing interLATA tele-
phone service business or to the assets the ILEC used to 
provide that service. This point alone would render the 
s 272 comparison inapposite for advanced services, which 
were previously provided by the merged companies, see 
Merger Order p 475. Yet the s 272 comparison is even more 
damning than that, for s 272 evidences Congress' considered 
judgment as to when an ILEC may legally provide telecom-
munications services through an affiliate and thereby avoid 
some of the Act's strictures. Since Congress prescribed no 
such affiliate structure for advanced services, we must as-
sume that Congress did not intend for s 251(c)'s obligations 
to be avoided by the use of such an affiliate.

 Congress thus has specified when conditions justify allow-
ing an ILEC to provide telecommunications services without 
s 251(c)'s duties. And it has specified when an ILEC may 
avoid the Act's burdens by providing telecommunications 
services through a separate affiliate, and what services that 
affiliate may provide. In short, the Act's structure renders 
implausible the notion that a wholly owned affiliate providing 
telecommunications services with equipment originally owned 
by its ILEC parent, to customers previously served by its 
ILEC parent, marketed under the name of its ILEC parent, 
should be presumed to be exempted from the duties of that 
ILEC parent.9

__________
merged company's "name, trademarks, and service marks on an 
exclusive basis." Merger Order p p 364-65.

 9 The Commission said that an affiliate can be a successor or 
assign, see Deployment Order p 90, but that this affiliate was 
neither. The Commission could just as well have determined that 
the affiliate was itself a part of the ILEC and thus did not trigger 
the "successor or assign" inquiry.

 That is not to say that the Commission would not be 
entitled to some running room in defining the terms successor 
and assign. For instance if an ILEC sold its advanced 
service to an unaffiliated company the Commission might well 
be entitled to conclude that the new company was not a 
successor and assign.

 The real explanation for the Commission's rather tortured 
statutory interpretation in this case is set forth powerfully in 
intervenor SBC's brief. It is argued that the Commission's 
order is justified because the clear purpose of the Telecom-
munications Act--particularly the requirements of s 251(c)--
is to prevent an ILEC from abusing its market power over 
the local loop to prevent competition. If an ILEC has no 
market power over advanced services, an affiliate structure to 
offer those services should be permitted by concluding it is 
not a successor or assign so long as the affiliate is sufficiently 
separate. Of course, if intervenor's economic analysis is 
correct it is not apparent why a separate affiliate would be 
necessary--or even useful. It could be thought that the 
affiliate structure is a non sequitur if an ILEC cannot use its 
local loop monopoly to leverage its position in the advanced 
service market.

 But whether or not SBC's premise is economically sound, it 
is unfortunately not Congress' premise. As the Commission 
concedes, Congress did not treat advanced services different-
ly from other telecommunications services. See Deployment 
Order p 11. It did not limit the regulation of telecommunica-
tions services to those services that rely on the local loop. 
For that reason the Commission may not permit an ILEC to 
avoid s 251(c) obligations as applied to advanced services by 
setting up a wholly owned affiliate to offer those services. 
Whether one concludes that the Commission has actually 
forborne or whether its interpretation of "successor or as-
sign" is unreasonable, the conclusion is the same: The Com-
mission's interpretation of the Act's structure is unreasonable.

 * * * *

 The order of the Federal Communications Commission is 
vacated in part.

 So ordered.