325 F.2d 68
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
HERMAN BROTHERS PET SUPPLY, INC., and Francis Herman d/b/a
Herman Brothers Bird Products, and Leon Herman,
d/b/a Herman Brothers Seed Merchants,
and Julius J. Herman, Respondents.
 No. 15253.
 United States Court of Appeals Sixth Circuit.
 Dec. 3, 1963.
 
 Seymour Strongin, Atty., N.L.R.B., Washington, D.C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Warren M. Davison, Atty., N.L.R.B., Washington, D.C., on the brief), for petitioner.
 Louis Rosenzweig, Detroit, Mich., for respondent.
 Before CECIL, Chief Judge, and MILLER and PHILLIPS, Circuit Judges.
 PHILLIPS, Circuit Judge.
 
 
 1
 Herman Brothers Pet Supply, Inc., one of the respondents in this proceeding, went out of business and sold all its inventory to the brother and son of its president and principal stockholder. The liquidation of this respondent and the sale of its assets took place immediately after the following sequence of events: A representation election conducted by the National Labor Relations Board in connection with which respondent was guilty of various unfair labor practices; a victory for the union in said election and certification of the union as the exclusive bargaining representative of respondent's employees; declarations by respondent's president and principal stockholder that he would never sign a union contract and would close up before he would admit a union into his business; the filing of unfair labor practice charges which resulted in a settlement stipulation ordering respondent to bargain with the union; and agreement upon the terms of a collective bargaining contract, which respondent thereafter refused to sign.
 
 
 2
 The Board issued an order against four respondents, viz.: Herman Brothers Pet Supply, Inc., a Michigan corporation (hereinafter called 'Pet Supply'), Julius Herman, individually, and Leon Herman (son of Julius) and Francis Herman (brothr of Julius), the two transferees to whom the business was sold, finding violations of 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. 158(a)(1) and (3), and directing respondents to cease and desist from such unfair labor practices, to reinstate six discharged employees and to post the customary notices. The order of the Board is reported at 138 N.L.R.B. No. 104. The Board has filed a petition in this Court for the enforcement of its order.
 
 
 3
 The case is somewhat unusual in that there is no real dispute in this Court as to the occurrence of the alleged unfair labor practices and the fact that such practices were committed by Pet Supply. The issue is whether the Board's order can be enforced against the two transferees of Pet Supply, and this, in turn, depends upon whether there was 'a true change of ownership * * * or merely a disguised continuance of the old employer.' Southport Petroleum Co. v. N.L.R.B., 315 U.S. 100, 106, 62 S.Ct. 452, 455, 86 L.Ed. 718.
 
 
 4
 Julius Herman, hereinafter referred to as 'Julius,' was in the pet supply business, both wholesale and retail, and he and his wife were sole owners of all the capital stock of Pet Supply. Julius was president of the corporation and he, his wife and his brother Francis constituted the Board of Directors. The brief of respondents describes the operations of Pet Supply as follows: 'Although Pet was a corporation it was a one-man business operated by Julius Herman.' Pet Supply employed four people in the retail end of the business and three at its warehouse.
 
 
 5
 In October 1960, the Detroit Board of Education commenced condemnation proceedings to acquire the property which housed Julius' offices and Pet Supply's retail business. In February 1961, Julius was notified that the acquisition had been completed. He eventually surrendered the premises in June 1961.
 
 
 6
 In the meantime some of the employees expressed interest in union representation and on February 27, 1961, the union won, by a 5-2 vote, a Board-conducted representation election. On March 7, the Board certified Local 283 of the Teamsters as the exclusive bargaining representative of Pet Supply's employees.
 
 
 7
 When Julius informed a union official that he would not sign a proposed contract, the union filed unfair labor practice charges against Pet Supply. This resulted in a settlement stipulation, entered June 19, 1961, which, among other things, ordered Pet Supply to bargain with the union. Pursuant to this, Julius met with the union for negotiations, at the conclusion of which Julius offered to sign the contract. At the suggestion of a union offcial, however, it was decided to postpone signing until the following Friday, June 23, to allow the employees to ratify the contract, and to give Julius time to consult his lawyer. This contract was never signed.
 
 
 8
 The union official was informed that Julius was ill and repeated attempts to contact him proved futile. When this official returned to the city on July 12, after an absence of two weeks, he was told that Julius had sold his business and that all but one of the employees had been discharged.
 
 
 9
 Essentially, Julius sold his retail business to his son, Leon, and his wholesale business to his brother, Francis. The latter was engaged in the manufacturing of pet supplies. The Board found that these purported sales were shams to avoid the obligation of bargaining, that the operation of Pet Supply actually continued as theretofore, and that Leon and Francis were, in this context, the 'alter egos' of Pet Supply.
 
 
 10
 The Board found, and it is not disputed, that both before and after the union election Julius interrogated employees at Pet Supply as to who had instigated the union movement and who had signed union cards. He told several employees that he would never sign a union contract, and that he would close his business before admitting the union. These acts clearly constituted a violation of 8(a) (1). N.L.R.B. v. Flemingsburg Mfg. Co., 300 F.2d 182 (C.A. 6); N.L.R.B. v. Bendix Corp., 299 F.2d 308 (C.A. 6); United Fireworks Mfg. Co. v. N.L.R.B., 252 F.2d 428 (C.A. 6). Having found that Leon and Francis were 'a continuation of the old employer,' the Board concluded that all the respondents had violated 8(a)(3) by discharging and refusing to rehire the six employees. Whereupon, the Board issued against all four respondents an order to cease and desist from these practices and to reinstate the discharged employees.
 
 
 11
 Respondents do not deny the alleged violations but contend that bona fide sales have been consummated and that the new owners are not subject to the Board's order. This contention is correct if there was in fact 'a bona fide discontinuance and a true change of ownership-- which would terminate the duty of reinstatement created by the Board's order.' Southport Petroleum Co. v. N.L.R.B., 315 U.S. 100, 106, 62 S.Ct. 452, 86 L.Ed. 718. If not, then the Board's order should be enforced. Ibid. This points up the issue now to be determined.
 
 
 12
 It does not necessarily follow that, if one sale is found not to be bona fide, the other must likewise be so declared, and for this reason we consider the two sales separately.
 
 
 13
 As for the sale to Leon, respondents contend this was a bona fide transfer, constituting a true change in ownership. They say that when Julius' retail store property on Buchanan Avenue was condemned, he had to move to a new location or dispose of his business. He discussed the transfer of the business and assets with Leon, his son, whereupon Leon rented premises in a building owned by Julius on Michigan Avenue. A bill of sale was executed, dated March 21, 1961, transferring the assets from Julius to Leon, delivery to be had when the Buchanan Avenue store was vacated. This occurred in June and respondents contend that Leon has been doing business since that time at the Michigan Avenue site under the name of Herman Brothers Seed Merchants, completely independent of Julius, and that this is not a continuation of Pet Supply.
 
 
 14
 Respondents admit that Julius spent a great deal of time at the Michigan Avenue store, purportedly run by Leon, but they say this was natural due to the father-son relationship. They argue that the family relationship should not be a consideration in determining the validity of the sale, but that it can be considered in explaining Julius' continued presence in Leon's store.
 
 
 15
 There were many findings, based on substantial evidence, which support the Board's conclusion that the sale to Leon was a fictitious transaction to avoid dealing with the union and to discharge those employees who supported the union. The bill of sale was executed two weeks after the Board had certified the union as the bargaining representative. Julius entered a settlement stipulation with the Board on June 19 and a few days later he negotiated with the union and offered to sign a contract. These acts are inconsistent with a sale of the business in March. By these acts Julius was acknowledging that Pet Supply still maintained the retail business and that he was its owner.
 
 
 16
 Even after the store was moved from Buchanan to Michigan Avenue, the record establishes that Julius continued to remain active in the business. The Board found that Julius went to the store one to three times a day, gave orders to Leon, arranged the discharge of one employee, and transferred another employee to the warehouse. All of this demonstrates that Julius maintained a substantial degree of control over the business claimed to have been sold to his son. Finally it is to be noted that Leon was only twenty-one years of age and the Examiner, who observed him during the proceedings, described him as 'a most immature young man.'
 
 
 17
 All of the above facts, which are supported by substantial evidence, lead to the conclusion that Leon's business was 'merely a disguised continuance' of Pet Supply, and therefore the Board's order is enforceable against Leon. Southport Petroleum Co. v. N.L.R.B., 315 U.S. 100, 106, 62 S.Ct. 452, 455, 86 L.Ed. 718; N.L.R.B. v. Fred P. Weissman Co., 170 F.2d 952 (C.A. 6); See also Reynolds Pallett & Box Co. v. N.L.R.B., 324 F.2d 833 (C.A. 6).
 
 
 18
 As for the transfer of the wholesale end of the business to his brother Francis, Julius contends that this was done because of his poor health and a decline in business over recent years.
 
 
 19
 As to Julius' poor health, it does appear that he had suffered from heart and lung maladies for a number of years. On the other hand, the Board found that after the sale to Francis, Julius spent several weeks working at the warehouse, lifting bags weighing as much as one hundred pounds, and personally doing some strenuous remodeling work. During this period, Julius also built racks and painted the floor at the retail store. As already pointed out, Julius went to the retail store one to three times a day.
 
 
 20
 These findings as to Julius' activities weigh heavily against the contention that Julius was incapacitated by his bad health to such an extent that this was the reason for the sale of his business, in the light of all the other circumstances in this case.
 
 
 21
 As to the alleged decline in business, Julius sought to establish this contention from a statement of profits and losses, based in part upon the cash register tapes. Two employees testified that the original tapes were thrown away and new tapes made up which omitted some substantial cash transactions. Julius testified to the contrary, thus posing a question of credibility. The Board approved the action of the Examiner in crediting the testimony of the two employees. It is well established that issues of credibility are to be resolved by the Examiner and that findings of the Examiner which are approved by the Board and based on conflicting but substantial evidence must be accepted by this Court. N.L.R.B. v. Power Equipment Co., 313 F.2d 438 (C.A. 6); United Fireworks Mfg. Co. v. N.L.R.B., 252 F.2d 428 (C.A. 6); N.L.R.B. v. Lester Brothers, Inc., 301 F.2d 62 (C.A. 4). It is significant that Julius previously had offered to sign the collective bargaining contract, which contract called for a substantial wage increase, all of which is inconsistent with the contention that the business was failing.
 
 
 22
 In the light of these findings, all of whih are supported by substantial evidence on the record, we cannot say that the Board erred in rejecting respondents' contention that Julius' poor health and a decline in business were the real reasons for the sale to Francis. Additionally, Francis admitted that he did not take an inventory of what he had bought and did not even know the location of some of the materials. As already mentioned, Francis was a member of the Board of Directors of Pet Supply.
 
 
 23
 Based upon these last mentioned facts, plus Julius' failure satisfactorily to justify the sale on other grounds, plus his anti-union animus and threats to close his business to avoid dealing with the union, the Board concluded that the sale to Francis was not bona fide. The record considered as a whole is reasonably susceptible to this inference, and, as a reviewing court, we are not free to draw a contrary inference even though we might do so were we hearing the case de novo. N.L.R.B. v. Power Equipment Co., 313 F.2d 438 (C.A. 6); Old King Cole, Inc. v. N.L.R.B., 250 F.2d 791 (C.A. 6); Reynolds Pallet & Box Co. v. N.L.R.B., 324 F.2d 833 (C.A. 6). Therefore, we cannot say that the order of the Board was erroneous in holding that there actually was a continuation of the wholesale end of Julius' Pet Supply. It follows that the Board's order should be enforced against Francis.
 
 
 24
 A decree will be entered enforcing the order of the Board against all four respondents.