**MAKELA WELDING, INC., and Kemp Welding, Inc., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 17348.

United States Court of Appeals
Sixth Circuit.

Dec. 15, 1967.

Judith Bleich Kahn, Ann Arbor, Mich., for petitioners, Theodore Messner and Gerald Vairo, Messner & LaBine, Houghton, Mich., on brief, Judith Bleich Kahn, Ann Arbor, Mich., of counsel.

Nancy M. Sherman, N. L. R. B., Washington, D. C., for respondent, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Atty., N. L. R. B., Washington, D. C., of counsel.

Before PHILLIPS, PECK, and Mc-CREE, Circuit Judges.

McCREE, Circuit Judge.

This case is before us on a petition to review and set aside an order of the National Labor Relations Board, reported at 159 N.L.R.B. No. 93, and on the Board's cross-petition for enforcement of its order.

Petitioner Makela Welding, Inc. (hereinafter Makela) operated a metal fabricating plant in Baraga, Michigan. Ninety per cent of the stock of Makela was owned by George Makela, Sr., his wife, and his son. On June 24, 1965, three Makela employees, Fallon, Kiiskila, and Lampinen, approached Kemppainen, who was general manager of Makela and also an officer and director, and a ten per cent stockholder, and requested a raise for Makela's 47 employees. Kemppainen stated that the company could not afford the raise. A similar request was made on two other occasions with the same response, and on July 8, all of Makela's employees commenced an economic strike.

On July 10, Kemppainen sent for Lampinen and stated that he was prepared to settle the strike by discharging 18 of the employees and giving the remaining employees a 5-cent hourly increase. Lampinen agreed to discuss this offer with the other employees, but later on July 10 Kemppainen, without receiving word from Lampinen, sent letters to 18 employees terminating their employment. Among the 18 were Fallon and Kiiskila, two of those who had been spokesmen in requesting a raise. George Makela, Jr., visiting at the home of a Makela employee, stated that "he was going to teach the troublemakers a lesson."

On July 12, Lampinen ascertained that the terms suggested by Kemppainen were unacceptable to the employees. On the evening of July 12, a meeting was held at which 28 Makela employees signed cards authorizing the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America (UAW) to be their bargaining representative. Eleven more signed cards were sent by mail to the union representative within the next few days. On July 13, the union representative wrote two letters to Makela, requesting that Makela enter into negotiations with the union, and stating that all Makela employees were willing to return to work under the conditions which prevailed before the strike. These letters were not answered. On July 22, Makela's remaining employees were notified that "negotiations for the sale of the assets of [the]

company" had been completed, and that their employment was terminated.

Kemppainen had discussed with the Makela family the possibility of purchasing the business in 1964, but no agreement was reached at that time. On July 17, 1965, Kemppainen and the Makelas agreed to terms for the sale of the business. These terms were approved by Makela on July 24, and by Kemp Welding, Inc. (hereinafter Kemp), a new corporation, on August 25. All the stock in the new corporation was owned by Kemppainen, his wife, and his daughter. The purchase price was $25,000, payable in weekly installments of $100, and Kemp was to take over Makela's accounts receivable as of July 1 and also to assume Makela's indebtedness to the Small Business Administration and to a local bank.

On July 27, Kemp commenced operations, fabricating items for Pettibone of Michigan, Inc., which had also been Makela's principal account. Kemp's work force at the outset consisted of 14 former Makela employees, and the majority of Kemp's personnel continued to be former Makela employees as the Kemp staff increased in size. Kemppainen served as general manager of Kemp, and Sarri, who had been the Makela foreman, assumed that position for Kemp. Kemp paid nearly all of the former Makela employees hourly wages of between 5 and 20 cents higher than those paid by Makela. Kiiskila, one of the men who had originally approached Kemppainen concerning a raise for Makela employees, was hired by Kemp on August 9. Fallon, another of the original spokesmen, was not hired. At the time of hiring, Kemppainen asked certain prospective Kemp employees about their feelings toward the union.

On September 16, the union requested that it be recognized by Kemp as bargaining agent for Kemp employees, then numbering about 25. Kemppainen informed the union that he disputed its majority claim, and refused a card check on the ground that cards signed by employees while working for Makela would not be binding on Kemp.

Based on the foregoing facts, the Board found that Makela had violated sections 8(a) (5) and 8(a) (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1), (5), by refusing to bargain with the union, had violated sections 8 (a) (3) and 8(a) (1), 29 U.S.C. § 158(a) (1), (3), by refusing to reinstate the undischarged strikers and refusing to rehire the discharged strikers, and had violated section 8(a) (1) by discharging Fallon and Kiiskila and by threatening reprisals. The Board found that Kemp had violated sections 8(a) (5) and 8(a) (1) by refusing to bargain with the union and by raising wages without bargaining, had violated sections 8(a) (1) and 8(a) (3) by failing to hire Fallon and by delaying the hiring of Kiiskila, and had violated section 8(a) (1) by interrogating applicants with regard to union sympathies. In fashioning the remedy for these alleged unfair practices, the examiner recommended, and the Board ordered, that Makela make its employees whole for wages lost between July 16 (the day following the demand for reinstatement) and July 26 (the day before Kemp commenced operations), and that Kemp should assume this back pay obligation if Makela fails to do so.

On appeal, Makela contests the findings of violations based on refusal to bargain and on failure to reinstate or rehire its employees. Kemp contests the findings of violations based on refusal to bargain and on changing the wage rates, and also questions the propriety of the order requiring it to fulfill Makela's back pay obligation should Makela fail to comply.

## I. Makela's Violations

Before the Board, Makela objected to the finding of unlawful refusal to bargain on the grounds that the corporation had entertained a good faith doubt as to the majority status of the union and that

> Any effort made by Makela in response to any Union demand would

have been purposeless since Makela had already committed itself to sell its assets and terminate its corporation existence and the employment status of its employees.

Here, Makela stresses the second ground. Makela's apparent abandonment of its claim of good faith doubt is understandable, for Kemppainen testified that he was aware that a majority of the employees had signed union authorization cards. Moreover, Kemppainen never informed the union of his alleged doubt, and in the absence of such communication, the claim of good faith doubt cannot be maintained. N.L.R.B. v. Crown Can Co., 138 F.2d 265 (8th Cir. 1943), cert. denied, 321 U.S. 769, 64 S.Ct. 527, 88 L.Ed. 1065 (1944).

Makela's second objection to the finding of an unlawful refusal to bargain raises important questions as to the effect of the decision of the Supreme Court in Textile Workers Union v. Darlington Mfg. Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). In *Darlington,* the Court held "that when an employer closes his entire business, even if the liquidation is motivated by vindictiveness toward the union, such action is not an unfair labor practice." 380 U.S. at 273, 274, 85 S.Ct. at 1001. Makela argues that in light of its decision to exercise the right guaranteed in *Darlington,* there would have been nothing to bargain about and its refusal to bargain was therefore not unlawful. The Board responds that, *Darlington* notwithstanding, an employer is under a duty to notify his employees' representative of impending discharges resulting from a planned sale of the plant so that there might be bargaining over such issues as severance pay. The cases cited by the Board are of little help in resolving this dispute, since they either involved no sale [1] or involved a transfer in which the transferee was the alter ego of the transferor in the sense that essentially the same business operations were involved and control remained in the same individuals.[2] Here, the sale was for valuable consideration and to a corporation with stock ownership substantially different from that of the transferor. (These facts are the apparent basis for the Board's conclusion that the sale was bona fide.) It might also be observed that all but one of the cases relied upon by the Board antedate *Darlington.*

■ We find it unnecessary to resolve this dispute at the present time because there is substantial evidence in the record to support the finding of an 8(a)(5) violation by Makela independent of any obligation to bargain concerning the effects of the sale. While the trial examiner's decision does mention "the requirement to bargain with the Union over the effect of the sale on the employees," it does not appear that he based his findings or his order on the existence of such a requirement. Kemppainen testified that the Makelas did not decide to

1. N.L.R.B. v. Royal Plating and Polishing Co., Inc., 350 F.2d 191 (3d Cir. 1965) (partial shutdown); International Brotherhood of Teamsters, Local Union 310 v. N.L.R.B., 108 U.S.App.D.C. 117, 280 F.2d 665 (D.C.Cir. 1960), cert. denied, 364 U.S. 892, 81 S.Ct. 224, 5 L.Ed.2d 188 (1966) (institution of independent distributorship plan).

2. N.L.R.B. v. Mackneish, 272 F.2d 184 (6th Cir. 1959); N.L.R.B. v. Rapid Bindery, Inc., 293 F.2d 170 (2d Cir. 1961); N.L.R.B. v. Lewis, 246 F.2d 886 (9th Cir. 1957).

In N.L.R.B. v. Aluminum Tubular Corp., 299 F.2d 595 (2d Cir. 1962), the court was asked to hold that it was an unlawful refusal to bargain for Aluminum to fail to bargain over the effects of a sale. The court noted that the case was "quite unlike" *Rapid Bindery,* supra, "where, having upheld a finding that the newly organized transferee which was continuing the transferor's business was the alter ego of the transferor, we pointed out the importance of notice to the union." The court went on to say:

The Board was warranted in finding that Aluminum was apprised of the Carpenter's desire to bargain and, we suppose, in concluding that it was an unfair labor practice for Aluminum *to have failed to answer that there was nothing to bargain about * * *.* 299 F.2d at 597. (emphasis supplied.)

This, of course, is anything but a finding that there is a duty to bargain over the effects of a sale.

sell their business until after the union had sought recognition. Hence, whether or not it was necessary to bargain concerning the effects of the sale, there was a refusal to bargain by Makela between the time it received the union's request and the time it decided to sell. The examiner's order supports the view that this was the basis of his finding. The order, as it relates to Makela's refusal to bargain, is phrased in hypothetical terms:

A. Makela Welding, Inc., its officers, agents, successors, and assigns, shall:

1. In the event it resumes operations, cease and desist from: * * *

(c) Refusing to bargain with the labor organization representing a majority of its employees in an appropriate bargaining unit.

Such an order is more appropriate to a finding of refusal to bargain during the operation of a continuing business than to a finding of refusal to bargain concerning the effects of a sale. Although the refusal to bargain during the short interval prior to the decision to sell cannot be viewed as a particularly momentous unfair labor practice, it is to be observed that a hypothetical order such as this is not particularly onerous. Compare N.L.R.B. v. Aluminum Tubular Corp., 299 F.2d 595, 597–598 (2d Cir. 1962).

■ Makela objects to the finding that it violated section 8(a) (3) and (1) by refusing to rehire the 18 strikers whose employment was terminated on July 10 and by refusing to reinstate the remaining strikers on the ground that the company had committed itself to sell its assets and that this sale, rather than the strike, was the reason for rejecting the offer to return to work contained in the union letter of July 13. We hold that the finding of the Board is supported by substantial evidence. As already mentioned in our discussion of Makela's 8(a) (5) violation, serious consideration of the sale did not commence until after Kemppainen had received the letter. Hence, although the sale was no doubt the reason for the termination of the remaining Makela employees on July 22, it is difficult to regard it as the reason for Makela's rejection of the earlier offer to return to work.

■ Also with regard to these 8(a) (3) and (1) violations, Makela objects to the Board's order requiring back pay for the period of July 16 through July 26. Makela argues that the terms of sale were agreed to on July 17 and that the employees were released on July 22, so that July 17, or, in the alternative, July 22, is the proper concluding date of the back pay period. In *Darlington*, supra, the Supreme Court quoted with approval the following statement in N.L.R.B. v. New Madrid Mfg. Co., 215 F.2d 908, 914 (8th Cir. 1954):

But none of this can be taken to mean that an employer does not have the absolute right, at all times, to permanently close and go out of business * * * for whatever reason he may choose, whether union animosity or anything else, and without his being thereby left subject to a remedial liability under the Labor Management Relations Act for such unfair labor practices as he may have committed in the enterprise, except up to the time that such actual and permanent closing * * * has occurred.

While the facts of this case make a determination of the time of the "actual and permanent closing" of Makela's business rather difficult, we perceive no basis for finding that Makela's discriminatory practices persisted beyond July 22, the date upon which the employees were discharged as a result of the sale. Accordingly, the order of the Board must be modified to require back pay through July 22 rather than through July 26.

## II. Kemp's Violations

■ Turning from Makela to Kemp, we first consider the objections to the Board's finding that Kemp violated section 8(a) (5) and (1) by refusing to comply with the union's September 16 bargaining request. Kemp

contends that the record contains no proof of the union's majority status at the time of the bargaining request. The Board's finding, however, was based on the theory that since Kemp's business operation was essentially the same as that of Makela, Makela's duty to bargain with the union would devolve upon Kemp. It has frequently been held that a mere change in ownership of a business is insufficient to alter a union's status as bargaining representative. N.L.R.B. v. Colten, 105 F.2d 179 (6th Cir. 1939); N.L.R.B. v. Downtown Bakery Corp., 330 F.2d 921 (6th Cir. 1964); N.L.R.B. v. McFarland, 306 F.2d 219 (10th Cir. 1962); N.L.R.B. v. Auto Ventshade Corp., 276 F.2d 303 (5th Cir. 1960); N.L.R.B. v. Lunder Shoe Corp., 211 F.2d 284 (1st Cir. 1954); N.L.R.B. v. Armato, 199 F.2d 800 (7th Cir. 1952). If, because of essential similarity of operations, Kemp can properly be regarded as Makela's successor, the absence of proof of majority status at the time of the bargaining demand would not necessarily undermine the Board's finding. N.L.R.B. v. Lunder Shoe Corp., supra. The successor can, of course, offer reasonable grounds for believing that the union has lost its majority status. N.L.R.B. v. Downtown Bakery Corp., supra. Here, however, Kemp has made no attempt to do so.

■ The facts in this case amply support the conclusion that Kemp's business operation is essentially the same as that of Makela. Kemp is using Makela's former plant and equipment, and is filling orders for Makela's principal customer. Kemppainen and Sarri supervise the work of Kemp, as they had done for Makela. Kemp has assumed the accounts receivable of Makela, as well as certain of Makela's financial obligations. The majority of Kemp's employees had formerly been employees of Makela, and although Kemp's work force has been smaller than that of Makela, this factor alone would not preclude continued representation by the union. N.L.R.B. v. Armato, supra.

■ Kemp argues further that even if its business operations are essentially the same as those of Makela, it is not obligated to bargain with the union because the union was never certified following a Board-supervised election. It is true that most of the cases holding a successor employer to be obligated to bargain with the representative of its predecessor's employees involved a certified union, although our decision in N.L.R.B. v. Colten, supra, did not. Moreover, we have often observed that the determination of a union's majority status by authorization cards rather than by an election is a process of questionable reliability. E. g., People's Service Drug Stores, Inc. v. N.L.R.B., 375 F.2d 551, 556 (6th Cir. 1967). On the facts of this case, however, we do not find that the absence of an election is sufficient reason to excuse Kemp from the obligation to bargain with the union. The time between the bargaining request directed to Makela (July 13) and that directed to Kemp (September 16) was relatively short and the record is devoid of evidence which would suggest that union representation was not desired by a majority of Kemp employees on the latter date. Finally, Kemppainen's admitted knowledge of the union's majority status at the time of the earlier request precludes any argument that union representation of Kemp employees would impose an unexpected or unjustifiable burden on that corporation.

■ Kemp objects to the Board's finding that it violated section 8(a)(5) and (1) of the Act by unilaterally increasing wages on the ground that it had no obligation to bargain with the union and on the further ground that no bargaining request was made until September 16, after many of the increases had already taken effect. We have already rejected Kemp's contention that it was under no obligation to bargain with the union. The record indicates that some wage increases were instituted after September 16, and at least with regard to those increases, the Board was correct in finding violations of section

8(a) (5) and (1). With regard to increases given prior to September 16, the absence of a bargaining request precludes a finding that 8(a) (5) has been violated but nevertheless permits a finding that there has been a violation of 8(a) (1). N.L.R.B. v. Valley Broadcasting Co., 189 F.2d 582 (6th Cir. 1951); Zall v. N.L.R.B., 202 F.2d 499 (9th Cir. 1953). But see Overnite Transportation Co. v. N.L.R.B., 372 F.2d 765 (4th Cir. 1967) (both sections violated). Although the Board's conclusion that each of Kemp's unilateral increases violated both sections of the Act may have been in error, no modification of the Board's order is called for, since the Board proposed no remedy for the 8(a) (5) violation based on unilateral wage increases over and above that proposed for the 8(a) (5) violation committed by Kemp in refusing to recognize the union on September 16.

### III. Kemp's Liability for Makela's Back Pay Obligation

Although we have held that Kemp is obligated to bargain with the union chosen by a majority of Makela's employees, this holding does not compel the further conclusion that Kemp must remedy Makela's unfair labor practices if Makela fails to do so.[3] In N.L.R.B. v. New Madrid Mfg. Co., 215 F.2d 908 (8th Cir. 1954), the case relied upon principally by the Board in imposing this liability on Kemp, the court said:

> It must be remembered that the Act does not purport to make the consequences of unremedied unfair labor practices a lien upon the enterprise, and there thus is no right to visit them upon a successor on that basis or in

that administrative spirit. A sucessor can be made to bear the burden of his predecessor's labor-relations wrongs, only in sound remedial relationship to the nature and circumstances of his immediate successorship. 215 F.2d at 914.

In *New Madrid*, supra, a basis was found for holding the successor liable in the fact that the successor "had personally participated in some of the unfair labor practices" of the predecessor. 215 F.2d at 915. The record in this case indicates that Kemppainen was a major participant in the unfair labor practices for which Makela was ordered to provide back pay. The court also found in *New Madrid* that the successor may have moved his plant in an effort to avoid the labor difficulties of the predecessor. While Kemppainen did not move the plant, the record suggests that he felt the mere purchase of the business would permit him to refuse to deal with the union.[4] In any event, participation by the successor in the unfair labor practices of the predecessor would seem to be of greater importance in determining liability than would the motivation of the successor in making the purchase.

Some of the other cases cited by the Board suggest that participation in a managerial capacity in the unfair labor practices of a predecessor is insufficient to render a successor liable to remedy those practices. In N.L.R.B. v. Fred P. Weissman Co., 170 F.2d 952 (6th Cir. 1948) and N.L.R.B. v. Tempest Shirt Mfg. Co., 285 F.2d 1 (5th Cir. 1960), the ownership of the successor was substantially the same as that of the predecessor. In N.L.R.B. v. Parran, 237

---

3. The Board discussed the distinction between the two types of obligation in M. Eskin & Son, 148 N.L.R.B. 1022, 1028. The Board pointed out that courts have sometimes relied mistakenly on cases involving the obligation to bargain in deciding cases having to do with the obligation to remedy unfair labor practices of a predecessor employer.

4. When, following the union's September 16 bargaining demand, Kemppainen was

offered a card check to verify the union's majority status, he replied by letter:
* * * be advised that Kemp Welding, Inc., disputes your statement inasmuch as Kemp Welding, Inc. is a separate and distinct legal entity and that any signed cards designating your Union as the representative were signed when said employees were employed by the Makela Welding Company and, as such, do not apply to Kemp Welding, Inc.

F.2d 373 (4th Cir. 1956), the court based the liability of the successor on the following reasoning of the Board:

As bearing upon this responsibility, we note that, because of his status as a prospective purchaser, Parran's relation to Oriole prior to his acquisition of this Company was more that of an owner than of a mere general manager. * * * Parran not only performed the duties of a general manager, he also financed to a substantial extent the operations of Oriole from his own personal funds. 237 F.2d at 375.

In our own case of N.L.R.B. v. Herman Pet Supply, Inc., 325 F.2d 68 (6th Cir. 1963), we considered whether a successor was obligated to reinstate employees of a predecessor who had been guilty of unfair labor practices. There, we held that the sale had not resulted in a true change of ownership and had therefore not been bona fide, and we enforced the order of reinstatement. We suggested that reinstatement would not have been ordered if there had been a true change in ownership, 325 F.2d at 70, but we were not called upon to consider whether a back pay obligation could be imposed in the case of a bona fide sale.

In the instant case, Kemppainen exercised broad powers in the management of Makela. He handled hiring, firing, work scheduling, and bidding for jobs with little or no consultation with the Makela family. Moreover, he owned ten per cent of the stock of Makela and served as an officer and director of the company. Although the sale of Makela resulted in a substantially complete change of ownership and the Board was correct in finding the sale to have been bona fide, we are of the opinion that given the particular facts of this case, the purposes of the Act will best be served by enforcing the order of the Board with regard to Kemp's liability in the event that Makela does not comply with its obligation to provide back pay.

Enforcement of the order of the Board, modified with regard to the length of the back pay period, is granted.