428 F.2d 775
 74 L.R.R.M. (BNA) 2664, 63 Lab.Cas. P 10,995
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
DIT-MCO INCORPORATED, Xebec Corporation, Xebec Corporation
DIT-MCO Electronics Division, Brooks Research, Inc., a
Subsidiary of Xebec Corporation, Brooks Research and
Manufacturing Company, a Subsidiary of Xebec Corporation, Respondents.
 No. 19794.
 United States Court of Appeals, Eighth Circuit.
 June 30, 1970.
 
 Sanford H. Fisher, Atty., N.L.R.B., for petitioner; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Abigail Cooley Baskir, Atty., N.L.R.B., were on the brief and reply brief.
 Dick H. Woods, of Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., for respondents; Earl J. Engle, and Stephen P. Dees, Kansas City, Mo., on the brief.
 Before MEHAFFY, HEANEY and BRIGHT, Circuit Judges.
 BRIGHT, Circuit Judge.
 
 
 1
 The employer, now operating as Brooks Research and Manufacturing, Inc., a subsidiary of Xebec Corporation, admits refusing to recognize or bargain with the Union (U.A.W., AFL-CIO, Local 710). The Board determined that the employer had violated 8(a)(5) and (1) of the National Labor Relations Act (29 U.S.C. 158(a)(5)(1)) by this recalcitrance. The employer seeks to justify its action on the basis that the Union does not lawfully represent its employees, citing three reasons. (1) The employees of DIT-MCO validly rejected union representation on an initial election which the Board erroneously set aside without a plenary hearing for a violation of the Peerless Plywood (twenty-four hour) doctrine. (2) The Union used coercive tactics in winning the second election, an election which the employer challenged and which the Board erroneously refused to set aside. (3) The second election, even if valid, has no binding effect on the present employer who claims not to be a successor to DIT-MCO.
 
 
 2
 The Board examined and rejected these contentions in a decision and order dated June 17, 1968, reported at 171 N.L.R.B. No. 178. The Board now petitions us pursuant to 10(e) of the Act (29 U.S.C. 160(e)) for enforcement of its order requiring the employer to bargain with the Union. We find substantial evidence on the record as a whole supporting the Board's finding that the employer violated 8(a)(5) of the Act by refusing to bargain with the certified representative of its employees, and we grant enforcement of the order.
 
 
 3
 The historical facts span a period of more than three years between January 11, 1965, the date of the first election, and the Board's decision of June 17, 1968. We chronologically examine each issue and its factual background.
 
 I.
 THE FIRST ELECTION
 
 4
 The Union initially sought to organize approximately eighty-eight production and maintenance employees of a Kansas City, Missouri, manufacturer of electrical testing equipment operating under the firm name DIT-MCO Incorporated. The employees rejected the Union by a vote of forty-one to thirty-five, but the Union protested that result claiming unfair employer tactics interfered with the election.
 
 
 5
 The Regional Director investigated and upheld three of the six grounds of the Union's challenge and recommended another election. The employer excepted to this report. The Board, without holding a plenary hearing as requested by the employer, adopted the Regional Director's finding that the employer violated the Board's rule which bans election speeches on company time to assembled employees within twenty-four hours of the scheduled election and ordered a second ballot. See Peerless Plywood, 107 N.L.R.B. 427 (1953).[1]
 
 
 6
 The Regional Director reported that a supervisor had called a meeting of approximately ten employees immediately preceding their voting and solicited their questions. In his answers, the supervisor discussed 'efforts of unionization upon the employees' working conditions'. This report to the Board contained no other information concerning the actual content of the supervisor's discussion with his crew. The respondent employer conceded the accuracy of the report, but urged an exception to its probative force contending that the supervisor merely advised the group that the company would give no 'automatic' wage increases during negotiations with the Union. The employer further noted that the supervisor's crew was subject only to merit wage increases. From these circumstances, the employer argued that an expression of the supervisor's personal, legal opinion influenced no employee and constituted no violation of Peerless Plywood. The employer offered to present testimony in support of its views.
 
 
 7
 These matters submitted in the employer's exceptions to the Regional Director's report warranted no plenary hearing on the Peerless Plywood issue. The employer's concession affirming the supervisor's discussion of possible adverse consequences of unionization with a significant percentage of employees, ten of the seventy-six who voted, establishes, at least facially, a violation of the Peerless Plywood rule:
 
 
 8
 Employers and unions alike will be prohibited from making election speeches on company time to massed assemblies of employees within 24 hours before the scheduled time for conducting an election. Violation of this rule will cause the election to be set aside whenever valid objections are filed. Peerless Plywood, supra, 107 N.L.R.B. at 429.
 
 
 9
 See also Honeywell, Inc., 162 N.L.R.B. 323 (1966). Cf. Great Atlantic & Pacific Tea Co., 111 N.L.R.B. 623 (1955). The employer did not dispute the essential facts which establish the Peerless Plywood violation, but sought to rebut the underlying inference that the proscribed speech impaired any worker's free choice in the first election. Peerless Plywood, however, announces an irrebuttable rule of policy and a showing that the employer's electioneering proved ineffective constitutes a legally irrelevant matter of fact.
 
 
 10
 Both parties cite Intertype Company v. N.L.R.B., 401 F.2d 41 (4th Cir. 1968), cert. denied, 393 U.S. 1049, 89 S.Ct. 686, 21 L.Ed.2d 691 (1969), as illustrative of cases enunciating the general rule. We quote from the opinion authored by Judge Sobeloff:
 
 
 11
 This court has held, however, that 'there is no requirement, constitutional or otherwise, that there be a hearing in the absence of substantial and material issues crucial to a determination of whether NLRB election results are to be accepted for purposes of certification.' NLRB v. Bata Shoe Co., 377 F.2d 821, 826 (4 Cir. 1967). * * * Since time is often a critical factor in election cases, NLRB v. Sun Drug Co., 359 F.2d 408, 414 (3 Cir. 1966), it is essential that representation petitions be processed expeditiously with a view to holding the election as soon after the filing of the petition as is reasonably possible. Thus, to insist that the Board conduct a plenary hearing for every objection raised during representation proceedings would, be encouraging dissatisfied parties to engage in this dilatory tactic, prevent the prompt disposition of election cases. Consequently, the courts have upheld the Board's practice of conducting administrative investigations when it appears that the factual issues involved are not of such magnitude that they can be resolved only after a full hearing. 401 F.2d at 44.
 
 
 12
 In accord, Southwestern Portland Cement Co. v. N.L.R.B., 407 F.2d 131, 135 (5th Cir.), cert. denied, 396 U.S. 820, 90 S.Ct. 59, 24 L.Ed.2d 71 (1969); N.L.R.B. v. Tenessee Packers, Inc., Frosty Morn Division, 379 F.2d 172, 178 (6th Cir.), cert. denied, 389 U.S. 958, 88 S.Ct. 338, 19 L.Ed.2d 364 (1967). Cf. N.L.R.B. v. Lord Baltimore Press, Inc., 370 F.2d 397, 401 (8th Cir. 1966). Consequently, the employer's additional showing raises no factual head-on clash of conflicting evidence nor dictates any necessity for a plenary hearing. The Board acted appropriately in setting aside the first election.
 
 II.
 THE SECOND ELECTION
 
 13
 Contrary to the results in the first election, the United, on May 27, 1965, won the second election by a vote of thirty-six to thirty-two. The employer, objecting to these results, contended the Union victory flowed from its use of coercive techniques upon the employees. After the Regional Director recommended a rejection of the challenge, the Board ordered a plenary hearing. The employer's challenge centered around remarks of a union activist to her fellow employees, which the employer characterized as constituting an express promise to waive Union initiation fees upon a Union victory for those joining the Union before the election.[2] The employer found support for its contention in a finding made by the Board's Hearing Officer that a plant employee delivering Union authorization cards to fellow employees stated that those signing cards before the election need not pay an initiation fee if the Union won. In the context made, the Hearing Officer determined these remarks to be inconsequential and affording an inadequate basis to draw any concluusion that improper union activity had coerced or impaired the workers' freedom of choice guaranteed by 7 of the Act (29 U.S.C. 157). The employer urged the Board to reverse these recommendations on the basis of the Lobue Bros. precedent, 109 N.L.R.B. 1182 (1954), and opinions of the First Circuit in N.L.R.B. v. Gorbea, Perez & Morell, 328 F.2d 679 (1964), and of the Sixth Circuit in N.L.R.B. v. Gilmore Industries, Inc., 341 F.2d 240 (1965). The Board responded by distinguishing the Lobue facts and overruling its precedent. In doing so, the Board reviewed its rulings both preceding[3] and following[4] the Lobue decision and concluded:
 
 
 14
 We are now of the opinion that no real distinction exists between a situation where the union offers to waive or reduce the initiation fees, but nothing is said about the election results, and one where, as in Lobue, the waiver is expressly conditioned on the outcome of the election. For, whether expressly told so or not, an employee must recognize that as a practical matter the waived or reduced initiation fee can become of value to him only if the union wins the election.
 
 
 15
 An employee entering this illusory arrangement with the union may indicate union support by signing a card authorizing the union to represent him, but he is not bound to vote for the union at a representation election. The Board has long recognized that unions traditionally offer reduced initiation fees during organizational campaigns. The Root Dry Goods Company, supra, 88 N.L.R.B. 289. Such an offer properly serves to breach an artificial barrier to union membership, the initial cost-- a factor usually not ignored by the employer resisting union organizational efforts. See Amalgamated Clothing Workers of America, AFL-CIO v. N.L.R.B., 345 F.2d 264, 268 (2d Cir. 1965).
 
 
 16
 By rejecting Lobue, the Board indicated it would no longer be bound by an artificial inference of coercion resting upon the difference between an unconditioned promise to waive union initiation fees for those employees signing cards before the election and a similar promise conditioned, however, upon a union election victory. We cannot say that such conclusion is inappropriate.
 
 
 17
 In this case, the Board enunciated a new policy regulating circumstances preceding an election-- 'that waivers, or provisional waivers, of union initiation fees, whether contingent upon the results of an election or not, have no improper effect on the freedom of choice of the electorate, and do not constitute a basis for setting aside an election.' The Board possesses broad discretion to regulate and establish election procedures. N.L.R.B. v. Wyman-Gordon Co., 394 U.S. 759, 767, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969). We think the Board's new policy falls within its discretionary powers to regulate the conditions under which an election may validly be held.
 
 III.
 SUCCESSORSHIP
 
 18
 DIT-MCO as the initial employer underwent several changes in corporate form between the second election and the Board's certification of the Union some twenty-three months later. First, in June, 1965, the company changed its name to Xebec Corporation, but it continued then existing manufacturing operations as DIT-MCO Electronics Division of Xebec.
 
 
 19
 Second and somewhat contemporaneously, in early 1965, DIT-MCO acquired practically all (ninety-nine-plus per cent) the common stock of Brooks Research, Inc. of Rochester, New York (Brooks I), a competitor also engaged in manufacturing electronic testing equipment. This competitor moved to Kansas City in March of 1965. Initially, upon the move, this company did not enter production, but in June it began producing automobile stereos and in September commenced manufacturing electronic testing equipment. Brooks I then maintained a corporate identity separate from DIT-MCO, although subject to the former's control. During this 1965 period, both Brooks I and DIT-MCO (Xebec) occupied different floors in the same building.
 
 
 20
 Third, these corporations effected changes in their status on November 1, 1965. Brooks altered its corporate name to Brooks Research and Manufacturing, Inc., and became a subsidiary of Xebec (Brooks II). It assumed jurisdiction over all manufacturing, including that of the DIT-MCO Division of Xebec. Seventy-four of seventy-eight of DIT-MCO Division's production and maintenance personnel and all of its supervisory personnel transferred to the Brooks II payroll. The combined production and maintenance force, thereafter, totaled one-hundred-sixteen employees. The Brooks II manufacturing operations moved to a new location in Kansas City, where it continued production of similar, but more sophisticated, electronic testing equipment to that produced earlier by its manufacturing predecessors, DIT-MCO or Brooks I. The company's finished product continued to bear the names of both DIT-MCO and Brooks Research. The former employees of DIT-MCO retained some degree of separate identity within the merged firm. They worked in a separate walled-off area of the plant, enjoyed a separate system of seniority from other Brooks employees and engaged primarily in electronic assembly, while former Brooks I employees performed mechanical operations in the manufacturing process. Considerations of economy, efficiency and utilization of a tax loss by the former Brooks corporation dictated the corporate changes and consolidation.
 
 
 21
 The seventy-nine employees of DIT-MCO eligible to vote in the election of May 27, 1965, shrank to thirty-three of ninety-six Brooks II employees as of the Union's certification in April, 1967.
 
 
 22
 On these facts, the Trial Examiner and the Board concluded:
 
 
 23
 (1) that Brooks Research and Manufacturing Company, a subsidiary of Xebec Corporation, is a successor to DIT-MCO, within the meaning of the Act; (2) that the operations of the successor are not so different from those of DIT-MCO, its predecessor, as to destroy the appropriateness of the original unit established by consent of the parties; * * *
 
 
 24
 It has long been settled that a duty to bargain may transcend the mere transfer of assets and employees from one employer to another. Overnite Transportation Co. v. N.L.R.B., 372 F.2d 765, 768 (4th Cir.), cert. denied, 389 U.S. 838, 88 S.Ct. 59, 19 L.Ed.2d 101 (1967); N.L.R.B. v. Colten, 105 F.2d 179, 183 (6th Cir. 1939). See Tom-A-Hawk Transit, Inc. v. N.L.R.B., 419 F.2d 1025 (7th Cir. 1969); N.L.R.B. v. Hurley Co., 310 F.2d 158, 160-161 (8th Cir. 1962). The critical inquiry is whether the 'employing industry remains essentially the same * * *', N.L.R.B. v. Auto Ventshade, Inc., 276 F.2d 303, 304 (5th Cir. 1960), and whether the nature of the employment rather than its source may be deemed continuous. N.L.R.B. v. McFarland, 306 F.2d 219, 220 (10th Cir. 1962). See generally, Tom-A-Hawk Transit, Inc., supra; Makela Welding, Inc. v. N.L.R.B., 387 F.2d 40, 46 (6th Cir. 1967).
 
 
 25
 Tested by these principles, the Board's conclusion that the employer remained essentially the same throughout its corporate transformations is amply supported by the facts in the record. By acquisition of Brooks I as a whollyowned subsidiary, DIT-MCO brought this separate corporate entity within the ambit of its control. Therafter, the corporate transformations of these companies represented only an internal metamorphosis, not the creation of an independent, separate business entity. That DIT-MCO Division initially provided the majority of all plant production and maintenance employees indicates, at least from the viewpoint of the employees, that Brooks II is a successor employer within the purview of the Act. See Makela, supra, 387 F.2d 40; Hurley, supra, 310 F.2d 158; N.L.R.B. v. J. W. Rex Co., 243 F.2d 356, 360 (3d Cir. 1957); N.L.R.B. v. Lunder Shoe Corp., 211 F.2d 284, 286 (1st Cir. 1954). The language of the Supreme Court in John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 549, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964), although written in a somewhat different context,[5] enunciates a concept of fairness in a national labor policy, which, by analogy, applies to the factual and legal successorship issue presented in this case.
 
 
 26
 Employees, and the union which represents them, ordinarily do not take part in negotiations leading to a change in corporate ownership. The negotiations will ordinarily not concern the well-being of the employees, whose advantage or disadvantage, potentially great, will inevitably be incidental to the main considerations. The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden charge in the employment relationship.
 
 
 27
 We are satisfied that the Board properly concluded that Brooks Research and Manufacturing Company, a subsidiary of Xebec, constituted a successor employer to DIT-MCO and, as such, became obligated to bargain with the Union.
 
 
 28
 Brooks' contention that it is entitled to avoid bargaining with the Union because it, in good faith, doubted the Union's majority status lacks merit. This argument rests upon the substantial turnover of production and maintenance employees between the second election in 1965 and the certification twenty-three months later. The employer offered no proof that the Union lost its majority status in fact. The Board's delay cannot be charged to the Union. Mere administrative delay affords no defense to an unfair labor practice charge. N.L.R.B. v. Katz, 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); N.L.R.B. v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1091 (8th Cir. 1969); N.L.R.B. v. Ozark Motor Lines, 403 F.2d 356, 359 (8th Cir. 1968). This policy of the law preserves the position of the contending parties as of the time of the election, not their posture at the close of litigation. If, in some instances, the rights of the majority are subjected to minority control, relief lies in seeking a change in representation through a new election following the statutory period of one year. See 29 U.S.C. 159(c)(3). Since plant personnel invariably change with the passage of time, a contrary policy would usually serve to reward a litigious antiunion employer at the expense of the union, regardless of the merits. See N.L.R.B. v. L. B. Foster Co., 418 F.2d 1 (9th Cir. 1969).
 
 
 29
 Accordingly, we grant enforcement of the Board's order.
 
 
 30
 MEHAFFY, Circuit Judge, dissents.
 
 
 
 [1]
 The Board deemed it unnecessary to consider other grounds underlying the Regional Director's recommendation-- that the employer interfered with a free election by altering, favorably to the employees, the company sick leave plan, and that the employer threatened employees with a loss of existing employment benefits should the Union win
 
 
 [2]
 The Union ordinarily charged $15.00 as an individual initiation fee
 
 
 [3]
 E. I. DuPont de Nemours and Co., 105 N.L.R.B. 710, 712 (1953); Marman Bag Company, Inc., 103 N.L.R.B. 456 (1953); The Root Dry Goods Company d/b/a The Root Store, 88 N.L.R.B. 289, 290-291 (1950)
 
 
 [4]
 Weyerhaeuser Company, 146 N.L.R.B. 1, 5 (1964); General Electric Company, 120 N.L.R.B. 1035, 1036-1037 (1958); A. R. F. Products, Inc., 118 N.L.R.B. 1456, 1458-1459 (1957); The Gruen Watch Company, 108 N.L.R.B. 610, 612 (1954)
 
 
 [5]
 Wiley determined an employer's contractual duty to arbitrate a labor dispute survived a corporate merger